IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

THE DOW CHEMICAL COMPANY,    )
                             )
          Plaintiff,         )
                             )C.A. No. 05-737-JJF
v.                           )
                             )
NOVA CHEMICALS CORPORATION   )
(CANADA), and NOVA           )
CHEMICALS, INC., (DELAWARE),)
                             )
          Defendants.        )


                    Friday, June 6, 2008
                    11:00 a.m.
                    Courtroom 4B


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge


APPEARANCES:


         MORRIS, NICHOLS, ARSHT & TUNNELL
         BY:  RODGER D. SMITH, ESQ.

              -and-

         JENNER & BLOCK, LLP
         BY:  HARRY J. ROPER, ESQ.
         BY:  AARON A. BARLOW, ESQ.
         BY:  DARRICK J. HOOKER, ESQ.

                    Counsel for the Plaintiff

1

APPEARANCES CONTINUED:

2

3

4          POTTER, ANDERSON & CORROON, LLP
           BY:  RICHARD L. HORWITZ, ESQ.
5
                    -and-
6
           FINNEGAN, HENDERSON, FARABOW,
7          GARRETT & DUNNER, LLP
           BY:  FORD F. FARABOW, ESQ.
8          BY:  JEFFREY W. ABRAHAM, ESQ.
           BY:  MARK J. FELDSTEIN, ESQ.
9
                    Counsel for the Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              THE COURT:  All right.  Be seated,

 2     please.

 3              Good morning.

 4              MR. SMITH:  Good morning.  Roger

 5     Smith from Morris Nichols on behalf of the

 6     plaintiff, Dow Chemical.  With me today is my

 7     co-counsel from Jenner & Block, I believe you

 8     already know Mr. Roper, Aaron Barlow who will be

 9     making our presentation today, and Darrick

10     Hooker.

11              THE COURT:  Good morning.

12     Welcome.

13              MR. HORWITZ:  Good morning, Your

14     Honor.  Nice to see you back up on the bench

15     instead of yesterday in the jury box.  That was

16     an interesting conference.  With me today, you

17     know Ford Farabow.

18              THE COURT:  Mr. Farabow, good

19     morning.

20              MR. FARABOW:  Good morning.

21              MR. HORWITZ:  Mark Feldstein and

22     also Jeff Abraham who I'm not sure has been

23     before you, at least not in this case before.

24              THE COURT:  Good morning.
```

```
 1    Welcome.
 2              All right.  We are here because
 3    Dow hasn't in view of the defendants properly
 4    prepared its privilege log and is apparently
 5    alleged to be withholding nonprivileged
 6    documents.  And I guess we should -- let me
 7    listen to you, how you think you want to go
 8    through this.  I have an open mind to it.
 9              MR. BARLOW:  What we have done is
10    Nova has selected thirty documents from our log
11    that they want submitted to the Court for in
12    camera inspection.  We have put them in a
13    logical order so they're grouped so you go
14    through one and maybe that makes the rest -- the
15    next two or three clear.
16              And we're prepared to hand that up
17    and go through them with Your Honor one by one,
18    or we can pick one from each category and do it
19    that way, whichever you prefer, and, you know,
20    what Nova would want to do.
21              THE COURT:  Mr. Farabow.
22              MR. FARABOW:  Your Honor, we
23    listed the documents in the attachment we sent
24    to Your Honor in numerical order as they appear
```

1    on their log.  I don't know whether they want to

2    give you the good ones first or the bad ones

3    first, but I'm willing to do it any way they

4    want to do it, Your Honor.

5              Mr. Roper told me he thought it

6    would save time to do it this way and that's

7    fine with me and I'm sure will be fine with the

8    Court.

9              THE COURT:  Okay.  What we'll do,

10   then, is follow -- I'll have you hand them up in

11   the form you've described and then I'll take a

12   look at it and you'll make your argument on it.

13   And I'll tell you what I think.

14             MR. BARLOW:  Sure.  Would you like

15   us to hand up all thirty at once or go through

16   them.

17             THE COURT:  Pass them up one at a

18   time so that -- the ones you're making your

19   presentation on.

20             MR. BARLOW:  Okay.  We'll do that.

21   We have a list, we have taken Nova's list and

22   reordered it in the way we're going to present

23   them and I'll hand that to Nova and we'll hand

24   that up with the first document, you can use it

```
1    as a checklist.
2                    THE COURT:  That will be good.
3    Are you oriented, Mr. Farabow, to the list that
4    he has?
5                    MR. FARABOW:  I have the list they
6    gave me, Your Honor, yes, which I think is the
7    same list, but just in a different order.
8                    THE COURT:  Just in a different
9    order.  Okay.
10                   MR. ROPER:  We have counted them
11   at least ten times.
12                   THE COURT:  Was that a Chicago
13   count?  I'm just checking.  No offense,
14   Mr. Roper.
15                   MR. ROPER:  None taken, Your
16   Honor.
17                   THE COURT:  Actually I finally
18   have gotten to Chicago.  It's really a great
19   place.
20                   MR. ROPER:  Glad you enjoyed it.
21                   THE COURT:  I did.  I was
22   impressed.  It's my new favorite spot.  It's
23   overtaken New York, even, although I have to
24   say, I was recommended and bit into the idea of
```

1    a Chicago hot dog, fully loaded.  That's an

2    experience.

3                    All right.

4                    MR. BARLOW:  What we've done is

5    we've put the privileged document in the folder

6    on the right, and on the left we have documents

7    that --

8                    THE COURT:  I hate to be a pain.

9    Do you have a copy for the clerks?

10                   MR. BARLOW:  Of the privilege

11   documents?

12                   THE COURT:  Do you have an extra

13   copy?

14                   MR. BARLOW:  We don't.  Sorry,

15   Your Honor.

16                   THE COURT:  All right.  No

17   problem.

18                   MR. BARLOW:  And then on the right

19   we have the supporting documents that tie up the

20   privilege documents to the testing.  For

21   example, a lot of the documents have numbers on

22   them, sample numbers that are cross-referenced

23   in a data book that was prepared by the Dow

24   technologists doing the testing.

1            And the way it worked was

2       Mr. Johnson who coordinated all the testing had

3       a technologist, Ken Reichek.  And the only thing

4       Ken Reichek did on Nova polymers was

5       infringement testing.

6            If you look behind the summary

7       sheet, there is a document, privilege number

8       2440, which is the data book assigned to Ken

9       Reichek and its title is attorney/client work

10      product, Nova.  So the reason we conclude this

11      in here is the privilege document, 1219, which

12      is the one we're looking at, is cross-referenced

13      to this data book.  And I can walk you through

14      how the cross-reference is shown in the

15      documents.

16            So if you're looking at the second

17      page of the data book, Your Honor, the page

18      right after the cover page of the data book, it

19      has what's listed as LIMS numbers, and

20      Mr. Johnson in a declaration we provided to Nova

21      with our new privilege logs explains that the

22      LIM system is an internal database of Dow they

23      use to keep track of testing they do.  And

24      samples get assigned LIMS numbers.

1           And what page 19 of this data book

2    shows is that LIMS number 57-520 was assigned to

3    a sample in this data book.  And if you look at

4    the privilege document 1219, 57-520 is one of

5    the samples that's being -- the test results of

6    shown of on the document.

7           THE COURT:  Now, am I to

8    understand that the data book cover sheet, and

9    there is two here.

10          MR. BARLOW:  Yes.

11          THE COURT:  Were prepared in 2004?

12          MR. BARLOW:  The first one was

13   prepared in 2004, yes.  And the second data book

14   was prepared in 2005.

15          THE COURT:  Five.  Which is

16   reasonably contemporaneous with the data

17   reporting sheet?

18          MR. BARLOW:  Yes, Your Honor.

19          THE COURT:  Well, the testing

20   results sheet.  They have dates on them.

21          MR. BARLOW:  The document 1219

22   does not have a date on it, but it presents data

23   from samples that were prepared by Mr. Reichek

24   and recorded in his work product data book.

1          THE COURT:  In the backup

2   documents?

3          MR. BARLOW:  Yes.

4          THE COURT:  I understand that 1219

5   doesn't have a date on it, but I understand that

6   to be basically a summary document.

7          MR. BARLOW:  1219?

8          THE COURT:  Yes.

9          MR. BARLOW:  Privilege document

10  1219 is a summary, that's correct, a summary of

11  other work product testing.

12          THE COURT:  Am I looking at the

13  principal document for those tests before they

14  were charted?

15          MR. BARLOW:  What you're looking

16  at records what Mr. Reichek kept to keep track

17  of the samples.

18          THE COURT:  And those are dated?

19          MR. BARLOW:  Yes, those are dated.

20          THE COURT:  And one has 11/05 on

21  it.

22          MR. BARLOW:  That's right.

23          THE COURT:  So I can understand

24  that that means that that testing was done in

1    '05?

2                    MR. BARLOW:  Yes.

3                    THE COURT:   In anticipation of

4    Nova litigation?

5                    MR. BARLOW:  That's correct.  The

6    testing that's shown on 1219 is referred to in

7    the second data book on page four, and it is

8    dated March 2005.

9                    And the second data book, which is

10   also from Mr. Reichek, who is the technologist

11   Mr. Johnson used solely for infringement

12   testing, not for competitive assessment testing,

13   this second data book is called Nova

14   attorney/client work product, that's the title

15   that Mr. Reichek put on it.

16                   And the reason he did that was

17   Mr. Johnson wanted to segregate the work product

18   testing from the competitive assessment testing.

19   So he had a different technologist do all the

20   work.  He asked Mr. Reichek to put all the work

21   in separate data books that were devoted solely

22   to work product testing, and so it would be

23   segregated into Dow's files.

24                   And what the documents shows is

1     the testing summarized in 1219 is one, on

2     samples that Mr. Reichek prepared and recorded

3     in his data book solely for litigation because

4     they're in his litigation data book.

5               And number two, the testing shown

6     here is further testing on the same samples as

7     recorded in the second data book which is again

8     Mr. Reichek's work product data books.  So that

9     ties up --

10              THE COURT:  1219 is work product.

11              MR. BARLOW:  Thank you, Your

12    Honor.

13              THE COURT:  Let's hand up the next

14    one.

15              MR. FARABOW:  May I respond, Your

16    Honor, on 1219?

17              THE COURT:  Yes, you may.

18              MR. FARABOW:  Thank you.

19              Your Honor, they are relying

20    principally on this declaration of Mr. Johnson,

21    which says that Mr. Reichek only worked on

22    litigation matters.  That's not true, Your

23    Honor.

24              May I hand up some documents?

```
 1              THE COURT:  Sure.

 2              MR. FARABOW:  Your Honor,

 3    Mr. Johnson has filed I think four declarations

 4    here, and each time there have been mistakes in

 5    the declarations.  The first declaration he

 6    filed said that all 1,950 documents on their

 7    list were work product or privileged.  We have

 8    now received about 600 of those which turn out

 9    not to be work product or privileged.

10              In this declaration that he filed,

11    he says, among other things, that Mr. Reichek

12    worked only on litigation matters and did not

13    work on competitive analysis.

14              If Your Honor would turn in the

15    book that I gave you -- have we given you a

16    book?

17              MR. BARLOW:  Yes.

18              MR. FARABOW:  To tab number one,

19    that is a document that was produced by Dow that

20    relates to something called Project Highlander

21    which was a comparative analysis of Nova and

22    other competitive products.  Mr. Reichek shows

23    up on the cover as one of the people that worked

24    on that.
```

```
 1                      If Your Honor would turn to page

 2        eight of that book, which has the last three

 3        production numbers 724, it shows in the next to

 4        the last column, Nova Surpass product being

 5        compared to various Dow products and Exxon

 6        products, that being competitive products.

 7                      Document number two in the book,

 8        Your Honor, deals with the same project,

 9        Highlander.  It talks about better product

10        design.  Mr. Reichek again shows up on the cover

11        as having worked on that project.

12                      And there are numerous property

13        comparisons in this book that deal with Nova as

14        well as other products.

15                      It is clear that Mr. Reichek, like

16        Mr. Johnson, was working on both competitive

17        analysis and also on perhaps the litigation

18        matters.  But it is totally unclear whether what

19        he was working on when he did this work was work

20        product or was competitive analysis.

21                      And I'm willing to bet, Your

22        Honor, that if you looked at only document 1219,

23        you would not find it to be work product because

24        there is nothing on that document, I believe, I
```

1    may be wrong, but I believe that will indicate

2    that that document itself is work product.

3                    Now, if you look at page ten of

4    document number two in the book that I handed

5    up, there is an analysis of Nova Surpass,

6    experimental results, discussion of various

7    portions of the product and what their impact

8    is.  So, Your Honor, our position is that

9    Mr. Reichek was working in both areas.

10                   I handed you up one individual

11   document in addition to Mr. Johnson's

12   declaration.  That individual document which has

13   production number 6111 at the end, Your Honor,

14   do you see that one?

15                   THE COURT:  Say that again.

16                   MR. FARABOW:  There is one

17   document I handed you not in the book, but a

18   separate document.

19                   THE COURT:  Yes.

20                   MR. FARABOW:  And it has at the

21   bottom 6111.

22                   THE COURT:  Yes.

23                   MR. FARABOW:  That document is an

24   analysis of Nova Surpass lots.  It says attorney

1    work product on it.  It refers to those

2    notebooks that Mr. Barlow was talking about, but

3    it is clearly just testing for competitive

4    purposes and has been produced by Dow to us in

5    the case.

6         It has other note -- what they

7    did, Your Honor, was take the samples that are

8    identified in those notebooks and they used them

9    for both purposes, they used them for

10   competitive analysis and they also used them

11   presumably for litigation materials.

12         Johnson headed up both projects,

13   Reichek worked on both projects.  Our view is in

14   light of your Pfizer, unless the document itself

15   reveals that it's work product and it is intend

16   solely for litigation or at least primarily for

17   litigation, it ought not be so held.

18         I can point out other errors in

19   Mr. Johnson's declaration, and probably as we

20   get to other documents, I would like to do so,

21   but I think that's what I wanted to say right

22   now, Your Honor.

23         THE COURT:  All right.

24         MR. BARLOW:  Your Honor, may I

1    respond?

2                 THE COURT:  Yes.

3                 MR. BARLOW:  First of all, with

4    respect to the spreadsheet that Mr. Farabow

5    pointed you to, he said that the data books on

6    here were the data books that I was referring to

7    that are work product.  They're not.  Not one of

8    these data books is a work product data book.

9    The data books, the work product data books are

10   listed in Mr. Johnson's declaration,

11   supplemental declaration.  Do you have a copy

12   for Mr. Farabow, which we have handed a copy of

13   that up to Your Honor?

14                 And none of the data books on

15   these pages are from that document.

16                 What this document is is a repeat

17   of the competitive assessment testing.

18                 In 2005, the competitive

19   assessment testing, the original competitive

20   assessment testing was two years old.  It had

21   been done in 2003.  So the attorneys requested

22   the competitive assessment testing be repeated,

23   just for comparison purposes.

24                 That is work product, but we

1    decided since it was competitive assessment

2    testing to moot the issue, we would just pursue

3    it.  When this competitive assessment testing

4    was collected in 2005, this repeat of the

5    competitive assessment testing, Mr. Johnson put

6    attorney work product on it because Mr. Roper

7    had requested he do this repeat.

8              However, it is the same testing

9    that was done before, so we decided to produce

10   it.  There is no -- the work that Mr. Reichek

11   has done has never been used for competitive

12   purposes at all.

13             The other documents that

14   Mr. Farabow pointed you to in the binder, those

15   are neither competitive assessment testing nor

16   infringement testing.

17             Mr. Reichek has other duties

18   within Dow, he doesn't solely work on Nova

19   polymers.  He was not doing any competitive

20   assessment testing of the Nova polymers in 2003.

21   All of his work on Nova polymers with respect to

22   determining their properties and what to do with

23   them with respect to competition or litigation

24   was solely on the litigation side.

1         The work in the binder is

2    fundamental blend studies conducted by Dow for

3    scientific purposes to understand blend

4    properties, this was not assessment of

5    competitor's products and how customers would

6    react to them.

7         So I don't think this takes away

8    from the clear record shown in the folder I have

9    handed up, privilege document 1219 doesn't refer

10   to any of the kind of testing that's shown in

11   the binder or in the other documents Mr. Farabow

12   pointed you to.

13        And, in fact, it's quite clear

14   that privilege document 1219 relates to data

15   books Mr. Reichek prepared entitled

16   attorney/client work product Nova, and Nova

17   attorney work client product, so the record is

18   clear that all of this work in 1219 was for

19   litigation and not for competitive assessment

20   purposes.

21        THE COURT:  All right.  Well, I

22   have taken a look at Tab 2 of Nova's binder

23   handed up, and specifically the page referred

24   to, page ten, Nova's Surpass 900-C, and I have

1    considered that page against the support that

2    1219 is a work product document, and it's clear

3    from both the data book and contemporaneous

4    E-mail that the 900-C testing was conducted in

5    contemplation of litigation under the direction

6    of attorneys and, in fact, for attorney meetings

7    and, in fact, over specific patent claims.

8              You don't have the benefit of what

9    I'm taking a look at, but there is an E-mail

10   here dated April 7th, 2004, that makes it real

11   clear they have targeted Nova, Nova 900-C

12   product, versus specific patents and specific

13   attorneys, and that this work was done that's

14   attached to have a meeting with the attorneys,

15   this is an April E-mail and they're going to

16   meet with the attorneys in June to prepare for

17   litigation with Nova.

18             And I'm obviously not an expert in

19   the technology here, but what's reported at page

20   ten of the Nova notebook is different subject

21   matter than what's in the data book and 1219,

22   and it's reporting on different subject matter.

23   Actually it's looking for claim infringement in

24   the makeup the 900-C product.

1            So I'm going to find 1219 to be

2    work product.  And we're going to maintain this

3    in a sealed record so it can be reviewed if

4    necessary later on.  And we'll maintain the Nova

5    notebook and mark it as Nova Exhibit 1 since I

6    have referred to it and page ten of Tab 2 in

7    further support that 1219 is privilege.

8            MR. FARABOW:  Your Honor, may I

9    add one thing?

10           THE COURT:  Yes, you may.

11           MR. FARABOW:  I would like to

12   point out that the document 6111 that I handed

13   up to you, Your Honor.

14           THE COURT:  Yes, I have it.

15           MR. FARABOW:  Has at the top, it

16   has Notebook Number 200302965, and that's the

17   first notebook that is listed in Mr. Johnson's

18   declaration as a privileged notebook.  So I

19   wanted to correct Mr. Barlow's statement that

20   that document did not refer to any notebooks

21   that were privileged.  That's the document that

22   has been produced.

23           I'm not trying to change Your

24   Honor's mind.

```
 1                    THE COURT:  You want to make the

 2        record clear.

 3                    MR. FARABOW:  Correct the record,

 4        yes, sir.

 5                    THE COURT:  And record this

 6        specific problem.

 7                    MR. FARABOW:  Yes, sir.

 8                    MR. BARLOW:  Your Honor, may I

 9        move on to the next document?

10                    THE COURT:  We'll also put as Nova

11        Exhibit 2 to the hearing that document, 6111.

12                    All right.  We're at 1267.

13                    MR. BARLOW:  Your Honor, the next

14        document is another test report with handwriting

15        of Mr. Johnson on it.  And there is also as with

16        the previous document, there is one of these

17        LIMS numbers on it, which is the internal

18        database number that is used at Dow to track

19        information about samples it test.

20                    And again, there is a Ken Reichek

21        data book, privilege document 2443 entitled

22        attorney/client work product Nova, that on page

23        eight identifies that LIMS number, 59408, and

24        ask that it be -- the sample be treated and
```

1    tested for a specific type of structure.  And

2    that's shown in highlighting in the document.

3           And there is another document,

4    again, showing that tying up that LIMS number

5    with one of Ken Reichek's work product data

6    books, and a note from Mr. Johnson to Ken asking

7    him to conduct the testing on this, on fractions

8    of Nova polymers.  And fractions is another

9    indication that this is work product testing

10   because the fractionation of the Nova polymers

11   was only done for work product purposes.

12           Mr. Johnson explains in his

13   declaration that competitive assessment testing

14   looks at the whole polymer and draws conclusions

15   about the whole polymer based on the kind of

16   information customers would like to see, whereas

17   to prove infringement, or to investigate

18   infringement, Dow had to take the polymer apart,

19   and that involved fractionation, so the document

20   refers to fractions on the -- in the handwriting

21   on privilege document 1267.  It refers to

22   fractions of the Nova polymers.

23           MR. FARABOW:  Two points I'd like

24   to make in response, Your Honor.  Number one is

1      going back to this document, 6111, it also

2      refers to those notebooks and yet this testing

3      was done as part of their competitive analysis.

4      So the mere fact that they take the sample from

5      that notebook and do further testing on it does

6      not show that it was done for litigation as

7      opposed to competitive analysis.

8                  The other point is that if you

9      would look in the notebook that I passed up to

10     page -- I mean to Tab 8, Your Honor.

11                 THE COURT:  All right.  You're

12     talking about Nova 1, Exhibit 1?

13                 MR. FARABOW:  Nova 1, yes, Your

14     Honor.

15                 Now, Mr. Johnson in his

16     declaration says flat out fractionation analysis

17     is not a part of the protocol for conducting

18     competitive assessment in the ordinary course of

19     Dow's business.  And that's what Mr. Barlow is

20     relying on.

21                 Well, here is a document where

22     they fractionated Exxon resins and where they

23     did testing on the fractionation for pure

24     product development and competitive analysis.

1            If Your Honor looks at the first

2      page, the first words are several LLD --

3                THE COURT:  Where are you at?

4                MR. FARABOW:  Tab 8, Your Honor,

5      in the notebook.

6                THE COURT:  Got you.

7                MR. FARABOW:  Sorry.  Several

8      LLDPE resins and their fractions, and they talk

9      about testing the fractions.  It says at the end

10     of that page an intense effort to the

11     investigation of structured-property

12     relationship of LLDPE resins and their

13     fractions.  If you go to page, the page that has

14     production number 20450 at the bottom, Your

15     Honor, 20450 in the Bates numbers at the bottom,

16     it's page four of the document, Your Honor,

17     fractions, it says the whole polymer was

18     fractionated into twenty-four fractions.

19            And down in the next to last

20     paragraph at the bottom of the page, two-thirds

21     of the way through that paragraph, the higher

22     molecular weight fraction has been shown to

23     shift the onset of strain harding to a lower

24     strain and to have a higher slope, those are

1    terms that are very relevant to this case, Your

2    Honor.

3                And on page six of the document

4    that has production number 20452.  The authors

5    of this document in the second line talk about

6    the -- these relationships are extremely

7    important to further product design and

8    development.

9                So they clearly did use

10   fractionation in the ordinary course of their

11   business, contrary to Mr. Johnson's declaration,

12   and the mere fact that something refers to

13   fractions doesn't indicate that it was being

14   evaluated strictly for litigation.

15               If you look at page 14 of that

16   document, they talk about mechanical data on

17   Exxon 3002 fractions.  If you look at document

18   nine in the book, Your Honor, they're analyzing

19   fractions or dividing fractions by a Tref of

20   Nova Surpass materials.  One more document I

21   would like to show the Court if I might is

22   document ten in the book.

23               THE COURT:  All right.

24               MR. FARABOW:  This is a document

1 dated May 2003, and under status of Nova Surpass

2 evaluation, they say that about five lines down,

3 Your Honor, under the heading status of Nova

4 Surpass evaluation, they talk about getting

5 samples to determine the competitive threat and

6 to evaluate versus key patents.

7    And two, or one paragraph further

8 down, they say, "We will plan for second tier

9 more advanced characterization like LCD and/or

10 fractionation."

11    It's just clear from all of this

12 that fractionation is not something that was

13 used solely for litigation, and so we contest

14 that argument that Dow is making here.

15    And we also contest Mr. Johnson

16 declaration which is just clearly wrong again in

17 multiple places.

18    MR. BARLOW:  May I respond, Your

19 Honor?

20    THE COURT:  Sure.

21    MR. FARABOW:  Thank you, Your

22 Honor.

23    THE COURT:  Thank you.

24    MR. BARLOW:  The document

1      Mr. Farabow pointed to which the document number

2      eight in his binder is from 1991, and it is not

3      competitive assessment, it is not taking a

4      competitive polymer and testing it to see how

5      much of a threat is this going to be, and what

6      can we do about it, what can we tell our

7      customers.  It is a fundamental scientific study

8      and says that in the first sentence, it's trying

9      to figure out the relationship between the

10     structure of the polymers and properties within

11     each fraction.

12               It's a scientific report conducted

13     based on several months, if not years, of

14     research within Dow to understand fundamental

15     properties of polymers, and it's of a scientific

16     nature.  It's not a competitive assessment.

17               And Mr. Johnson is correct,

18     fractionation is not the done for competitive

19     assessment.

20               Furthermore, the documents, the

21     documents included with privilege number 1267

22     show that the testing discussed, this testing

23     shown in 1267, was done under Ken Reichek's

24     coordination.  He recorded the results.  He

1      recorded the requests in his privilege data book

2      entitled attorney/client work product Nova, and

3      it is special fractionation conducted for

4      litigation purposes.

5              The last document that Mr. Farabow

6      pointed to was from the very early days of when

7      the Surpass product was on the market.  And it

8      was when Dow saw the Surpass product and

9      realized there might be an issue with its own

10     patents.  So it set up a process to as the

11     document says, evaluate the product versus key

12     patents.

13             And some of the testing referred

14     to in here, including fractionation, was for the

15     patent infringement analysis, not for the

16     competitive assessment test.

17             And finally, Your Honor, the data

18     book numbers on document, the Exhibit 2, Nova

19     Exhibit 2, the data book numbers for the samples

20     tested are all in row six of the document, and

21     none of them are on Mr. Johnson's list of

22     attorney/client work product data books.

23             THE COURT:  Well, essentially Nova

24     is arguing and I understand the argument, that

1   sometimes testing can have multiple purposes,

2   and then you can draw out of that testing, you

3   know, for whatever purpose, results for whatever

4   purpose you want.  And that was the case in the

5   dispute that Nova cited.

6           I'm looking very carefully at

7   these documents and comparing them to what Nova

8   is trying to argue as a wedge to get behind the

9   work product.  In other words, if there is some

10  cross purposes of this testing.

11          I have looked very carefully at

12  both the first document and now 1267, and read

13  the notes of Mr. Reichek and what he essentially

14  was -- the purpose of his fractionation was.

15  And it's clear from the documents on what he's

16  reporting and the problems he's having is he's

17  trying to do it for claim comparison, and not

18  for any competitive purposes, at least in these

19  documents.

20          Now, the documents that

21  Mr. Farabow has, I would agree, they show if not

22  a single purpose of competitive analysis, they

23  show a cross purpose and those documents should

24  have gone over and I assume that's why Nova has

1      them.

2                     MR. BARLOW:  That's correct, Your

3      Honor.

4                     THE COURT:  But a review of this

5      document and its supporting documents make it

6      clear that this was testing for a specific

7      litigation purposes.  And they had a specific

8      goal they were seeking, vis-a-vis the claims

9      under two patents.

10                     So I'm going to find 1267 to be

11      work product and protected under that privilege.

12                     MR. BARLOW:  Your Honor, the next

13      document is 1269, and that one shows some

14      results of testing on the fractions of two sets

15      of fractionations of Dow's -- of Nova's

16      polymers.

17                     Set number one is -- for example,

18      set number one is shown on the first page in

19      diamonds, and those are a series of fractions of

20      one sample of Nova's polymers.  And set number

21      five which is shown as squares is a set of

22      samples of another set, a set of fractions of

23      another sample.

24                     If you look in the supporting

1      documents at the first page marked of the tab,

2      this page shows all the data on the first page

3      of 1269 plus data from two other sets of

4      fractionations.

5                  And the reason I'm going to this

6      document, the 255 which is in the supporting

7      materials, is this document further on at the

8      red tab includes the LIMS numbers, and these

9      LIMS numbers again are tied to Mr. Reichek's

10     data book, which is included at the back.

11                 So what this collectively shows is

12     that Mr. Reichek conducted some fractionations

13     of the Nova polymers, recorded those

14     fractionations and the results in his data book,

15     did some further testing on each fraction, which

16     he recorded in two places, one, which is in

17     document 255, shown in the supporting materials,

18     which does have LIMS numbers tying it up to his

19     data books.

20                 And the other is in 1269, the

21     identical data is there, but this is a printout

22     that Mr. Johnson had in his files of just a few

23     of the pages of this analysis, so it doesn't

24     have the LIMS numbers on there to tie it up.

1              But, again, using the LIMS numbers

2       and the data book, one data book is entitled

3       attorney/client work product Nova, and the other

4       is entitled Nova attorney work product,

5       attorney/client work product, they're both

6       Mr. Reichek's data books.

7              And the type of testing that's

8       shown is also referred to in a slide that was

9       prepared as a result of a meeting between Dow

10      and Jenkins & Gilcrest.  And the title of the

11      slide is follow-up action plan, and it mentions

12      at the very bottom the exact type of testing

13      shown on the first page of 1269, and the slide

14      was forwarded to Greg Porter of Jenkins &

15      Gilcrest, Mike Glenn, Bruce Kanuck and Steve

16      Krupp, the last three people are in-house

17      attorneys of Dow, and the E-mail cover says it

18      refers to a planning meeting and the summary of

19      what was discussed and decided.

20              THE COURT:  I can tell,

21      Mr. Farabow, they're working real hard to get

22      your client in their sights here.  There are

23      have --

24              MR. FARABOW:  Your Honor, it's a

1    tough argument when they come up with three or

2    four supporting documents that we haven't seen.

3    I don't know exactly how to argue --

4              THE COURT:  Let me give you a

5    quote.  Firm up additional results on the '045.

6    I mean, they're sighting your client, no

7    question, and product.  And then, I mean, I wish

8    I could show you because it would make you feel

9    better, but they're relating that testing

10   directly to that sighting up.

11             MR. FARABOW:  Okay.  Your Honor, I

12   can't argue with that, Your Honor, except that I

13   want to reserve until the end renewing our

14   motion on need as to these particular documents,

15   so I want to alert the Court at this point,

16   these are not core work product documents, and I

17   think there are two points that I will want to

18   make at the end of our hearing.  Hopefully I

19   won't have to make them because you would have

20   found at least ten documents that are going to

21   free all of these up.

22             But one point is they don't want

23   us to know about all this fractionation work

24   they did, 30,000 pages of fractionation over

1    three years.  I don't think they ought to be

2    allowed to come in and use fractionation to use

3    their case of infringement and hold back these

4    documents.  That's point number one.

5              And point number two is they've

6    got a special machine that they use that nobody

7    else has got.  It's described by one of their

8    inventors as a huge Treff machine that's not

9    available on the market.  And therefore, I think

10   that is an argument that I want to make to you

11   at the end, that this noncore work product, we

12   need to see it so we can prepare our defense, so

13   those two points I just want to reserve, I don't

14   want you to think I'm giving up at this point,

15   Your Honor.

16             THE COURT:  I know you better than

17   that.

18             MR. FARABOW:  Thank you, Your

19   Honor.

20             THE COURT:  Thank you.

21             1269 I'm going to find is

22   protected by the work product privilege.

23             MR. BARLOW:  2216 is the next one.

24   While it's being handed up, can I respond

1    briefly to two things Mr. Farabow said?

2            THE COURT:  Okay.

3            MR. BARLOW:  First of all, the

4    fractionation.  Fractionation covers a lot of

5    ground.  There are many different types of

6    fractionations and the reason we're withholding

7    this as work product is once we have the same

8    information Nova has, we're in the same position

9    they are, and know the two things they are

10   blending together, then we can target our

11   fractionation precisely.

12           This fractionation was shooting in

13   the dark.  We didn't know where the two

14   components came from, and the fractionation that

15   we are withholding is not something we are going

16   to rely on, but we may use fractionation in a

17   targeted way based on information that Nova has

18   produced in this case.

19           THE COURT:  You ought to know that

20   you can't use this fractionation because there

21   were problems in the testing --

22           MR. BARLOW:  Right.  Right.

23           THE COURT:  -- that skewed the

24   results.  And that's what makes it interesting

1    reading.  Maybe after the case Mr. Roper will

2    buy you a bottle of wine and share it, but I

3    understand what you're saying.

4              MR. BARLOW:  And then the other

5    thing is, this huge Treff machine that they are

6    talking about, that machine they can have

7    discovery on, they just can't have discovery on

8    the testing we did of their products in

9    anticipation of litigation, that's our position.

10             The huge Treff machine they can

11   get discovery on and, in fact, it's not

12   something nobody else can build.  It's well

13   known in the published literature and it's not a

14   one-of-a-kind device at all.

15             This next document, 2216, is a

16   series of E mails, and the first E-mail is from

17   Ken Reichek, seeking assistance from another

18   scientist on slope of strain hardening.

19             And Ken is the work product

20   technologist that Mr. Johnson used.  And he

21   identifies four polymers that he ran slope of

22   strain hardening testing on.  And then in one of

23   the supporting documents, the data book shows

24   each of those samples.  Slope of strain

1    hardening is a claim limitation, it is not

2    something that's used for competitive assessment

3    because customers don't talk about slope of

4    strain hardening.  And so the testing that was

5    done as recording in Mr. Reichek's data book was

6    part of his analysis of the Nova patent

7    enforcement issue.

8               He then sends the data to another

9    scientist to attempt to get assistance on

10   analyzing the data.  And so that's why this

11   document relates to our work product testing and

12   shows the types of testing we were doing.

13               THE COURT:  Mr. Farabow.

14               MR. FARABOW:  Thank you, Your

15   Honor.  If I can refer you back to our Nova

16   Exhibit 1 book, to document number four in the

17   book, Your Honor.  This is slope of strain

18   hardening data on Nova Surpass 900-C.  This is

19   the kind of data that is run, it talks about

20   stress versus strain, and this is the data

21   that's used to draw those stress/strain curves.

22               If Your Honor turns to Tab Number

23   5, this is a data book titled slope of strain

24   hardening study done by Mr. Reichek who only

1     apparently Mr. Johnson says does litigation

2     work, but this document was produced to us and

3     apparently relates to other than litigation

4     work.

5               If Your Honor looks at the page

6     numbered 91553 at the bottom, this is a group of

7     testing done to determine the slope of strain

8     hardening, which is exactly the kind of data I

9     understand is in the document that is under

10    consideration.

11              If you turn to 557, Your Honor,

12    there is testing in this same notebook on Nova

13    Surpass products as shown on that page, the

14    first two items tested or Nova Surpass.  Here

15    they're doing intensive, a tier analysis, but

16    slope of strain hardening is what this notebook

17    is all about.

18              And Mr. Reichek is doing the

19    testing.  And it has nothing to do with

20    litigation as best I can determine.

21              If Your Honor looks at document

22    six in the notebook, this is slope of strain

23    hardening testing done on Nova 900-C product,

24    this is SHC testing, probably looks exactly like

1    some of the documents that are on this list, I

2    hope, Your Honor.

3              And so our point is that they were

4    doing slope of strain hardening testing for

5    competitive analysis, product development.  I

6    think Mr. Barlow has tried to pigeon hole

7    competitive analysis too much.  One of the

8    reasons they were doing competitive analysis was

9    to compare their product with ours and with

10   Exxon's to try to see how they could improve

11   their products.  So when we're talking product

12   development, we really are talking a part of

13   competitive analysis.

14             And again, Your Honor, our point

15   is if the document itself doesn't show that it's

16   for litigation purposes, then it ought not to be

17   held back.  If it does like the other ones Your

18   Honor has looked at, then I can't argue with

19   that.

20             Thank you.

21             THE COURT:  All right.

22             MR. BARLOW:  Your Honor, slope of

23   strain hardening is something in the claims and

24   it is based on a way of analyzing stress/strain

1       data, load extension data, but stress/strain

2       data can be used for other purposes.  And that's

3       why we produced documents like document number

4       four in his binder and document number six in

5       his binder.

6               Document number six, it's just

7       stress/strain data, that's it.  There is no

8       slope of strain hardening analysis at all.  It

9       doesn't even refer to slope of strain hardening,

10      it is simply stress/strain data and it could be

11      used for competitive purpose.

12              Slope of strain hardening is not

13      done for competitive assessment purposes, but

14      stress/strain data may be.  Tinsel curves are

15      sometimes used for competitive assessment

16      purposes.

17              The other documents that

18      Mr. Farabow pointed to, the data book of

19      Mr. Reichek's where he did slope of strain

20      hardening testing on Nova Surpass, that was part

21      of the same Highlander fundamental scientific

22      study that we talked about earlier and which is

23      shown in documents one and two in the binder.

24              It is not competitive assessment

1    testing on Nova's polymers, it's not saying

2    let's take Nova's polymers, see how it stacks up

3    against ours.  It is a scientific study to say

4    let's look at all the blends out there and see

5    how they work so we can understand better how

6    polymers, how the molecules in polymers interact

7    with each other to result in final properties so

8    that sometime in the future we can design

9    another polymer.

10            Mr. Reichek did work on that, but

11   in terms of the competitive assessment testing

12   of Nova that was done in 2003, that Nova has

13   tried to say all of this testing that

14   Mr. Reichek -- Mr. Johnson supervised was for

15   that purpose, this work in 2005 on this

16   Highlander fundamental study is not part of the

17   competitive assessment testing that was done.

18            THE COURT:  That's where I'm a

19   little confused.  There was competitive testing

20   from what I can tell in 2003.

21            MR. BARLOW:  Yes, that's right.

22            THE COURT:  And there were

23   specific products that were compared.

24            MR. BARLOW:  That's right.

1             THE COURT:  And specifically, the

2     '03 testing had to do with the slope of strain

3     hardening tinsel curves.

4             MR. BARLOW:  The '03 testing, the

5     competitive assessment?

6             THE COURT:  Well, tell me.

7             MR. BARLOW:  Well --

8             THE COURT:  The '03 testing.

9             MR. BARLOW:  There was slope of

10    strain hardening testing in '03, but it was for

11    litigation purposes, it wasn't part of

12    competitive assessment.  The slope of strain --

13    the competitive assessment testing in '03, that

14    looks at the properties the customer cares

15    about, like machine tear, viscosity, density,

16    how it reacts to impact, to a strike with a

17    dart, how it reacts if you make it into a film

18    and try to tear it.

19             Slope of strain hardening

20    especially in the case of a patent focused on a

21    fraction of the polymer, not the entire polymer,

22    and so slope of strain hardening is not --

23             THE COURT:  If you're testing the

24    Nova Surpass product in '03 for potential

1    litigation on the hardening issue.

2                  MR. BARLOW:  Yes.

3                  THE COURT:  Right.

4                  MR. BARLOW:  Yes.

5                  THE COURT:  Why would you

6    reference in the document a Dow product, or a

7    Dow sample?

8                  MR. BARLOW:  The Dow sample was

9    for comparison purposes --

10                 THE COURT:  But why would you --

11                 MR. BARLOW:  -- for infringement

12   reasons.  Because --

13                 THE COURT:  In the other documents

14   you are referring to the patents and claims?

15                 MR. BARLOW:  Right.

16                 THE COURT:  In this document,

17   there is reference to do you product lots.

18                 MR. BARLOW:  Well, this was in the

19   very early days of the infringement testing, and

20   Dow was trying to figure out what did Nova put

21   together to make this blend.  And part of

22   assessing that, the polymer was tested in

23   different ways, different pieces of the polymer

24   were tested together, and the Dow polymer is

1    something the Dow scientists knew very well and

2    knew how it was put together, so by comparing to

3    Nova polymers against the Dow polymers with this

4    test they might be able to figure out here is

5    how we should chop it up in order to find out

6    whether they have a component A and component B

7    that are in your patent.

8              THE COURT:  Well, in the subject

9    document, which is an E-mail, what would

10   intrinsic to the document set it apart from an

11   at least partial or competitive -- to be

12   discussing at least in part a competitive

13   comparison, what in this E-mail would you point

14   me to that would convince me that it's not at

15   least partially competitive?

16             MR. BARLOW:  Well, Ken Reichek at

17   this time was -- his only work on Nova was on

18   infringement testing, and as I've said, he has

19   never done any competitive assessment testing

20   designed to figure out what do we tell our

21   customers, how much of a threat will this be in

22   the marketplace.  He is the one that started

23   this off and sent the data on to the next person

24   for analysis.  That's number one.

```
 1                  And number two, the slope of
 2      strain hardening study, while that can be used
 3      for scientific purposes, it's not used for
 4      competitive assessment purposes, it's not used
 5      to say well, what's the customer going to think
 6      of the slope of strain hardening because the
 7      customer doesn't care.  So those are the things
 8      intrinsic to the document.
 9                  In addition to that, we have the
10      contemporaneous, the fact that on September 4th,
11      Mark Johnson as shown in the data book, Mark
12      Johnson requested the slope of strain hardening
13      be conducted and that's part of Mr. Reichek's
14      Nova patent enforcement data book.
15                  THE COURT:  What I'm going to do
16      is reserve decision on this document, which is
17      2216, which is an E-mail.  And let's move -- let
18      me just hold this one for a minute, 2216.
19                  MR. FARABOW:  Yes, sir.
20                  THE COURT:  We have to move a
21      little more quickly because I would like to get
22      through all of them, not do them
23      representatively.  828.
24                  MR. BARLOW:  Okay.  This one is
```

1     notes of Mr. Johnson on different tests to be

2     conducted to fractionate the Surpass polymers to

3     break it down into its pieces to test.  And the

4     reason they were doing that was to apply the

5     claims of the Dow patents which are directed to

6     the pieces of the polymer.

7              So on the document itself, it

8     references four types of testing that I have

9     identified with the letters A, B, C and D, and

10    there is a discussion in the privilege, in the

11    document 828 about conducting those tests.

12             And then in the attached document

13    which is a Ken Reichek data book entitled Nova

14    patent enforcement, attorney/client work

15    product, he includes on page five a statement,

16    Mark Johnson asked me to submit the following

17    samples for analysis and characterization, and

18    it includes each of the four tests listed on the

19    handwritten note.

20             And, in fact, mentions for the

21    last one, labeled D, mentions the purpose is to

22    isolate a particular fraction of the Surpass

23    polymer.  And the isolation of the fractions is

24    the purpose of the work product testing.

 1                    In addition to that, there is a

 2      discussion of deconvolution the fractions on 828

 3      which is highlighted and Mr. Johnson explains

 4      deconvolution is a mathematical analysis that is

 5      not done for competitive assessment testing, it

 6      was done here to figure out how to target the

 7      fractionation, they were shooting in the dark,

 8      they didn't know how Nova put the polymers

 9      together so they were trying to use

10      deconvolution to try to get an idea.

11                    THE COURT:  All right.

12      Mr. Farabow.

13                    MR. FARABOW:  Thank you, Your

14      Honor.  I would like to point you to Document 7

15      in Nova Exhibit 1, which indicates on the cover

16      that the competitive assessment was still

17      ongoing in August of 2006, the competitive

18      assessment of Nova product.

19                    And if Your Honor would please

20      turn to the page numbered 5671 at the bottom, it

21      says under the heading not infringement

22      litigation, under the heading practicing elite

23      technology, it says Dow has dissected Surpass

24      polymers, expertise in polymer characterization,

1    material science and modeling.  They're doing

2    all this stuff as part of their competitive

3    analysis.

4              Now what of it is done for

5    evaluating infringement and what of it is done

6    for competitive analysis, in fact, Mr. Johnson

7    was heading up both, so our position is whatever

8    he was getting from one he was using for the

9    other.

10             Mr. Johnson apparently sent this

11   information to I believe it was Mr. Reichek.

12   Johnson is not a lawyer, Reichek is not a

13   lawyer, their claim is Johnson was acting as an

14   agent for attorneys, but he was also head of

15   their competitive analysis.

16             So, again, Your Honor, unless

17   there is something in the document they're

18   asserting work product on which indicates that

19   it was directed primarily to litigation

20   purposes, we think it ought to be produced

21   because it clearly had a joint purpose.

22             THE COURT:  All right.  Thank you.

23             MR. FARABOW:  Thank you, sir.

24             THE COURT:  With regard to 828,

1    and the subject matter being a targeted

2    fractionation specifically directed toward a

3    potential litigation issue, I find that it falls

4    under the work product privilege protection.

5    And that that is internally apparent.  It's

6    apparent in the document itself.  So 828, the

7    privilege will be upheld.

8             832.

9             MR. BARLOW:  832 is another set of

10   notes.  This one is a request from Mark Johnson

11   to Ken Reichek to conduct a number of tests,

12   some of them were ones we just saw in the

13   previous document, including the one second from

14   the bottom that mentions isolating a particular

15   fraction.

16             And it shows also the same list in

17   the same format with the same checkmarks appears

18   in Mr. Reichek's data book which is titled Nova

19   patent enforcement attorney/client work product

20   on page five, and shows the same tests in the

21   same order and it relates -- this is a lot like

22   the last document, Your Honor, same types of

23   tests are referred to.

24             THE COURT:  All right.

1    Mr. Farabow.

2              MR. FARABOW:  I wonder if all the

3    tests are directed to litigation or even if any

4    of them from what Your Honor has seen are

5    specifically directed to litigation.  And if

6    they're not, our position is they ought to be

7    produced.

8              THE COURT:  Well, you know, I'll

9    tell you there is a little pattern developing

10   here that the fractionation testing is pretty

11   clearly directed at litigation.  And that's --

12   again, there is some interpretation, but that's

13   internal to the documents, that finding.

14             The slope of strain hardening on

15   the curves, that's where I'm not so sure.  And

16   that's because of what is internal in the

17   documents.

18             MR. FARABOW:  Yes, sir.

19             THE COURT:  So this basically is a

20   fractionation request, so I'm going to find 832

21   to be privileged, but I'm looking real hard at

22   that strain hardening.

23             MR. FARABOW:  Thank you, Your

24   Honor.  If I might just say, Your Honor, when

1          they were testing, when they were fractionating

2          the Exxon samples, that wasn't for litigation

3          purposes, so I mean, if the document internally

4          says it's for litigation purposes, I have no

5          argument with the Court, if it just says

6          fractionation.

7                         THE COURT:  And it's broad, I

8          understand that.

9                         MR. FARABOW:  Thank you, Your

10         Honor.

11                        THE COURT:  I'm on to that, I

12         hope.

13                        MR. BARLOW:  The next document is

14         a slope of strain hardening document and I think

15         this one shows more clearly that it's related to

16         the litigation.

17                        In the supporting documents in

18         addition to Mr. Reichek's data book, we have

19         some notes between -- notes of the meeting that

20         Mark Johnson had with Steve Bulk.  Steve Bulk is

21         a professor at a university in Canada, and he

22         was -- and it's the second document behind the

23         cover sheet, it's Number 961, the handwritten

24         document on the left.

1               Doctor Bulk, Professor Bulk was

2      retained as a consultant to look at the

3      infringement testing.  He was retained in

4      anticipation of litigation to consult on whether

5      Nova infringed Dow's patents, and he suggested

6      some ways of analyzing the data.

7               So, for example, if you look in

8      the notes of the meeting with Mr. Bulk it refers

9      to doing some measurements and checking for

10     variability and it says fifty samples and then

11     it changes that to thirty samples, and that's --

12     I believe that's marked with a letter A.

13               And then if you look on the

14     notebook, Mr. Reichek's notebook, this shows the

15     thirty samples.  It starts with the request,

16     Mark Johnson asked me to run slope of strain

17     hardening on thirty repeats, and it's dated two

18     days after the meeting with Steve Bulk.

19               And if you look at the bottom row,

20     specimen number 30, and the data that's shown

21     there, highlighted in the second, third, fourth

22     and fifth columns for row 30, it's identical to

23     the results shown on the first page of Privilege

24     Document 1771.

1           So this shows that Privilege

2     Document 1771 was an analysis of data requested

3     by a consulting expert to analyze Dow's

4     infringement proofs in anticipation of

5     litigation.

6                THE COURT:  Mr. Farabow.

7                MR. FARABOW:  Hard for me to

8     respond without having the documents, Your

9     Honor.  I think you're in a better position than

10    I am to look at them.  I don't think the

11    privilege -- a claimed work product document, in

12    fact, itself indicates any work product

13    activity.  I have no way of knowing whether the

14    other documents support that or not.

15               THE COURT:  All right.  So I'm to

16    understand that the purported protected document

17    that summarizes and charts the slope hardening

18    testing done by Nova.

19               MR. BARLOW:  Done by Dow, yes.

20               THE COURT:  I mean done by Dow.

21               MR. BARLOW:  Yes.

22               THE COURT:  And when was the

23    document prepared?

24               MR. BARLOW:  The 1771?

```
1                    THE COURT:  Yes.  Because in

2       essence part of what it reports is what I've

3       already found to be privileged in part, anyway.

4                    MR. BARLOW:  Oh, right.  Yeah.

5       You mean the part --

6                    THE COURT:  In other words, I

7       found one document to be privileged, it at least

8       in part is what is supportive of 1771, the same

9       kind of testing being protected.

10                   MR. BARLOW:  That's correct, same

11      kind of testing.

12                   THE COURT:  Right.  But when was

13      1771 prepared?

14                   MR. BARLOW:  The date -- it's an

15      electronic document, so the date we had for it

16      was January 26, 2005.  And the Steve Bulk

17      meeting was January 18th, 2005.  The request

18      recorded in Mr. Reichek's notebook was January

19      20, 2005, so then the analysis was six days

20      later, the analysis in 1771 is six days later on

21      January 26th, 2005.

22                   THE COURT:  All right.  Consistent

23      with my other finding, I find that 1771 is

24      privileged.
```

1              MR. BARLOW:  The next series of

2      documents are related to each other and it's a

3      different kind of testing.  This is testing at

4      the very beginning of the time period, 2003,

5      when infringement testing was conducted.

6              861 is a handwritten request from

7      Mr. Johnson to Mr. Reichek asking for some

8      testing to be conducted.  It's dated 828, 2003.

9      And on the same day, Mr. Reichek opened a new

10     data book entitled Nova Patent Enforcement,

11     attorney/client work product, and the first

12     entry which is the next day, August 29th, 2003,

13     it repeats the request that was made of him.

14     And it repeats the specific type of analysis or

15     what was being looked for and it mentions what

16     was being looked for in the Nova polymer.

17              And this was the type of testing

18     to try to identify the catalyst in Nova's

19     polymer which is not part of competitive

20     assessment testing.  This testing is rather

21     extensive testing, and takes a lot more time

22     than the competitive assessment testing.

23              THE COURT:  What I read here,

24     again, this doesn't -- I understand what you're

1    saying about its purpose, you know, what you're

2    looking for, the catalyst liquid, but this isn't

3    going to be used in this case.

4              MR. BARLOW:  No, definitely not.

5              THE COURT:  From what I can read.

6    Although it was prepared to do an infringement

7    analysis.

8              MR. BARLOW:  It was for another

9    patent, it wasn't for the patents-in-suit.

10              THE COURT:  Right.  It's looking

11   bad, Mr. Farabow.  I mean, you can't read this,

12   but it's not even going to be used in the case

13   and what they're -- but it's clear that they're

14   looking for claim infringement related to

15   catalyst liquid.

16              MR. FARABOW:  Sounds like we don't

17   have to worry about that one.

18              THE COURT:  You don't have to

19   worry about this one.  861 is privileged.  And

20   we can tell from the document they can't even

21   use it.

22              MR. BARLOW:  862 is related to the

23   same subject.

24              THE COURT:  I think Mr. Farabow

1    very cleverly has gone to document -- to compel

2    document production really in an effort to have

3    motions in liminae to exclude.  Pretty clever

4    litigation strategy he's got going here.

5                    All right.  862.

6                    MR. BARLOW:  862 relates to the

7    same analysis, and it's E-mail exchanges between

8    Dr. Stevens who is going to do the analysis and

9    Mr. Johnson about the analysis and how they were

10   going to do it.  And it's dated on August 27th,

11   the first E-mail, Dr. Stevens offers to do the

12   analysis.  The same day Mr. Johnson replies at

13   the top of the E-mail.

14                    The next day in the note we just

15   looked at in 861, Mr. Johnson request that Ken

16   give sample to Dr. Stevens so he can do the

17   analysis and then the day after that,

18   Mr. Reichek records in his work product data

19   book that he's going to do that.

20                    THE COURT:  This clearly falls

21   under the same finding as 861.

22                    MR. FARABOW:  Your Honor, as long

23   as it indicates in the document itself that it's

24   for patent analysis purposes, I can't argue it.

1    I think I just want to point out to the Court

2    that at this point in time, they are

3    characterizing Nova's Surpass samples for the

4    dual purpose of competitive analysis apparently

5    and also for consideration of litigation.  And I

6    would also point out that Nova Exhibit 2 shows a

7    detailed analysis for components of catalysts

8    and so forth, so they were doing this for a lot

9    of different purposes.

10            This one Your Honor can see and I

11   can't, and it may indicate that it's for patent

12   purposes and I'm glad it's not involved in this

13   case.

14            THE COURT:  Yes.  It's not going

15   to be in this case.

16            MR. FARABOW:  Thank you, sir.

17            THE COURT:  862, privileged.

18            MR. BARLOW:  2261 is a third

19   document on the same subject.  This is the next

20   week, Mr. Johnson is saying -- asking

21   Mr. Stevens how long --

22            THE COURT:  Here what is I'm going

23   to do.  These are all pretty clear, it's a

24   strain here.  So I think Mr. Farabow understands

1    the ruling and he's made his point if it's --

2    you know, that hopefully I would find intrinsic

3    to the document that it was being analyzed --

4    the product being analyzed for litigation and

5    the patents were not competitive purposes or

6    even part competitive purposes.  And it's clear

7    here that the experiments were for the

8    identification and analysis of the catalysts,

9    and it really is very directed.  And then also,

10   that none of this is going to be able to be used

11   in this litigation.

12              Okay.  So 2261.  Is the rest of

13   the strain to this?

14              MR. BARLOW:  That's the rest for

15   this subject matter.

16              THE COURT:  Okay.

17              MR. BARLOW:  The next document

18   relates to slope of strain hardening, and it's

19   2277.  And it's a chain of E-mails.  And if you

20   go to the last page of the chain there is an

21   E-mail, the second E-mail in the chain begins

22   Steven Krupp and I are evaluating the

23   enforcement of one of our patents.  It

24   identifies it against Nova.  We are collecting

1        strain hardening data and need to know and then

2        it goes on.

3                     Steve Krupp is a patent attorney

4        at Dow.  And then the E-mail chain is a result

5        of this request to get this information.

6                     And we think the document the way

7        it begins shows it was -- this inquiry was for

8        purposes of getting ready for litigation on the

9        patents against Nova.

10                    THE COURT:  It's all this stuff

11       when you get into these cases, it's amazing what

12       people put in E-mails.

13                    MR. FARABOW:  I have always

14       believed that, Your Honor, and I sure would love

15       to see it.

16                    THE COURT:  In the Lipitor case

17       there was a string of E-mails where they were

18       talking about we didn't get the right thing, and

19       they were looking for raising HDLs and they

20       wound up lowering LDLs.  And they didn't know

21       why.  And they argue with the marking

22       department, $12 billion a year later, it's

23       crazy.  This is real patent talk, they're trying

24       to figure out a lot of things about the patents

1    and Nova here.

2             MR. FARABOW:  All right, sir.  But

3    it's a funny series.  So where do you put those

4    dog bones, but it's all about your client and

5    the patents and the strength aspect of the

6    patent versus your products, so 2277 is

7    privileged.

8             You think there ought to be a

9    course for business, people will read those ten

10   years later, you should be more careful.

11            MR. BARLOW:  Your Honor, the next

12   document is closely related to the one we just

13   looked at.  These are handwritten notes of Mark

14   Johnson from a discussion he had with Shih-Yaw

15   who is one of the correspondents.

16            THE COURT:  Who we now know works

17   at home a lot.

18            MR. BARLOW:  In Singapore.

19            THE COURT:  Yes.

20            MR. BARLOW:  Right.  Exactly, Your

21   Honor, in the chain, in the E-mail chain, there

22   is discussion of arranging for a call between

23   8:00 and 9:00 a.m. on February or September 26,

24   and 7242.

1          THE COURT:  I don't think you have

2     to argue this much.  Mr. Farabow understands the

3     tracking on the other document.  This is clearly

4     the same person.  It's arranging a phone call

5     about the subject matter, so I'm going to find

6     1188 privileged for the same reasons.  It's just

7     a follow-up to discuss the data.

8          MR. BARLOW:  The next one is

9     related as well.  It is a precursor to the

10     E-mail chain we just looked at and it is an

11     instruction of slope of strain hardening and in

12     it Kalyan recommends that Mark review this with

13     Shih-Yaw.  And this is dated the day before the

14     8:00 a.m. conference call, or 8:00 a.m.

15     discussion between Mark and Dr. Lai about this

16     testing.

17          So this document 2283 led directly

18     to the one you just looked at which was an

19     E-mail from Mark Johnson saying Steve Krupp and

20     I are looking at this infringement issue, so

21     this is also related to that subject.

22          THE COURT:  And, again, the

23     document itself demonstrates that after talking

24     about putting the testing on spreadsheets and

1     comparisons for infringement purposes, 2283

2     privileged.

3                MR. BARLOW:  2317 is also related

4     to slope of strain hardening, not the same

5     exchanges we have just looked at, but in the

6     supporting documents, the last one is a

7     presentation --

8                THE COURT:  Well, this falls in

9     the same line.  Mr. Farabow, just for your

10    entertainment, now they're trying to figure out

11    how you measure the slope.

12                MR. FARABOW:  We would love to

13    know that, Your Honor.

14                THE COURT:  Yes, basic stuff here.

15                MR. FARABOW:  Doesn't tell it in

16    your patent, Your Honor.

17                THE COURT:  I'm not getting into

18    that yet.  But I'm going to give you a hint that

19    it really is on the patent.

20                2317 is privileged, clearly, and

21    it tracks, Your Honor, the other documents.

22                MR. BARLOW:  1200, these are

23    measurements of slope of strain hardening of the

24    -- this relates to some of I think the testing

1    we saw in an earlier document, testing on Nova

2    Surpass's product, and the data that's in 1200

3    is shown as well in the Ken Reichek data book

4    entitled Nova patent enforcement.

5                    If you look at -- I'm sorry, it's

6    in the second Ken Reichek data book, the last

7    document in the supporting materials.  If you

8    look at the last page, the highlighted line,

9    those numbers in columns one, two, three, four

10   and five, are the slope data shown on pages one,

11   two, three, four and five respectively of

12   document 1200, and the slopes have been

13   highlighted to show the correspondence.  So this

14   is part of the testing that Dr. Reichek did with

15   respect to the Nova patent enforcement issues.

16                    THE COURT:  Now, the product Dowex

17   is produced pursuant to or under what?

18                    MR. BARLOW:  That's a commercial

19   product.

20                    THE COURT:  Under what patent?

21                    MR. BARLOW:  Not these patents,

22   but it is discussed in these patents as prior

23   art.

24                    THE COURT:  It's discussed in the

1    subject -- in the patents-in-suit.

2              MR. BARLOW:  Yes, as prior art.

3              THE COURT:  As prior art.  And, of

4    course, that's a Dow patent, prior art?

5              MR. BARLOW:  Yes, it's a Dow

6    product, correct.

7              THE COURT:  Product, I mean.

8              MR. BARLOW:  Yes.

9              THE COURT:  Mr. Farabow.

10              MR. FARABOW:  Your Honor, we've

11    shown that Mr. Reichek and others at Dow were

12    doing slope of strain hardening tests on Nova's

13    product in Exhibits 4, 5 and 6 of Nova Exhibit 1

14    that were not related to litigation, but rather

15    to the competitive purposes.

16              We've also shown in Exhibit 8 that

17    Dow tested Exxon products for slope of strain

18    hardening related to competitive purposes.

19    Dowex is a different product that is not

20    intended to be competitive with the products in

21    this case.  You can't compare -- Your Honor

22    knows you can't prove infringement by comparing

23    your product to the other side's product.  When

24    you do that, you're doing it for commercial

```
1      purposes.

2                      Again, if there is a reference in

3      here to the claims or to comparing it to the

4      claims or to the patent then --

5                      THE COURT:  There is reference

6      here to the patent -- subject matter of the

7      patent and -- well, let me just say, to the

8      subject matter of the patent, and features of

9      products that would be produced under the

10     patent, and how you might test for those

11     features.

12                     MR. FARABOW:  But they claim that

13     they are elite products which are competitive

14     products and which are the very products they

15     were dealing with in their competitive analysis

16     are within the scope of the patents, so this

17     could well have been a competitive analysis

18     document, unless they're evaluating it versus

19     the claims.

20                     THE COURT:  Well, that's what I

21     think they're doing and I think they're trying

22     to figure out how to evaluate, is what I think.

23     I mean, as part -- as you read document to

24     document, you get some sense of the testing back
```

1    in -- this is in September of '03.

2                    MR. FARABOW:  This is early on.

3                    THE COURT:  This is early on,

4    they're trying to figure some things out here

5    about the patents vis-a-vis your client's

6    product.

7                    MR. FARABOW:  Well, Your Honor,

8    then --

9                    THE COURT:  I don't see anything

10   that would be competitive here.

11                   MR. FARABOW:  Okay.  Well, we're

12   into -- let me make a different argument then.

13                   THE COURT:  Okay.

14                   MR. FARABOW:  If they haven't

15   decided whether they have got a lawsuit yet or

16   not --

17                   THE COURT:  No, they're looking

18   for you.

19                   MR. FARABOW:  Okay.  All right.

20                   THE COURT:  No.  No.  Early on

21   they wanted Nova in a lawsuit.  I mean, that's

22   clear.

23                   MR. FARABOW:  It took them a long

24   time, Your Honor.

1           THE COURT:  It did.  That's

2     interesting.  What took so long from back then,

3     just being careful.  I don't get it.

4           MR. ROPER:  There was a lot of

5     testing to make sure they were absolutely sure.

6           THE COURT:  They kept testing all

7     the products and kept talking about their

8     patents and wanted to go after Nova, it's

9     interesting why they would wait -- I guess they

10    didn't have the testing complete to where they

11    were satisfied.  The law firm they had was not

12    your law firm.

13          MR. ROPER:  No, it was not, Your

14    Honor.

15          THE COURT:  It was a different law

16    firm, but that was their litigation law firm?

17          MR. ROPER:  Yes.  We were involved

18    in some litigation at the time.  I don't

19    remember exactly what was going on, but this

20    other firm, yes, was indeed gearing up for

21    litigation.

22          THE COURT:  And that's who is

23    directing Mr. Johnson?

24          MR. ROPER:  At this point,

```
 1      correct.

 2                      THE COURT:  From what I can see

 3      here.

 4                      MR. ROPER:  Yes.

 5                      THE COURT:  That's interesting.

 6                      MR. FARABOW:  I think Mr. Roper

 7      may have misstated, because I don't think Porter

 8      came into it until 2004 as I recall.

 9                      MR. ROPER:  That may be.

10                      MR. FARABOW:  And this is 2003, so

11      Johnson I think in these documents says he's

12      working with in-house.

13                      THE COURT:  To get ready for that.

14                      MR. FARABOW:  That's what he says.

15                      THE COURT:  Where is that law

16      firm, Porter?

17                      MR. BARLOW:  Texas, Your Honor,

18      Houston.

19                      MR. FARABOW:  Jenkins & Gilcrest I

20      think is the name.

21                      THE COURT:  Jenkins & Gilcrest and

22      they're in Texas.

23                      MR. FARABOW:  Mr. Horwitz says

24      they are no more.
```

1              THE COURT:  They don't exist?

2              MR. HORWITZ:  That's right.

3              THE COURT:  Okay.  All right.

4         We're at 1196.

5              MR. BARLOW:  All right.  1196 is

6    another example of the exact type of document we

7    have just looked at.  It has the slopes shown on

8    the last page, one by one.  The last page is not

9    a competitive assessment document, it's a page

10   from one of Mr. Reichek's work product data

11   books.

12              The testing is requested on a page

13   from another Ken Reichek data book that also

14   request fractionation testing.  So we think for

15   the same reason as the last one, this is clearly

16   work product.

17              THE COURT:  All right.  For the

18   previous reasons I find 1196 is work product.

19              MR. BARLOW:  The next document is

20   handwritten calculations of the average slope

21   from the exact data that was on the document we

22   just looked at, 1196.  So it's just a

23   handwritten calculation showing the slope and

24   then a calculation of the slope of strain

1    hardening coefficient based on that.

2              But if you look at the data that's

3    averaged here, it's the same data from the data

4    book that we just looked at, except that it's

5    rounded to two decimal points.  But if you look

6    at the average number, it's identical, and so

7    this is the same information as we just looked

8    at.

9              THE COURT:  I'm not -- this is

10   whose writing?

11             MR. BARLOW:  This is Mark

12   Johnson's writing.

13             THE COURT:  Right.

14             MR. BARLOW:  Yes.

15             THE COURT:  And it is the same

16   information that's in the document?

17             MR. BARLOW:  Yes.  He's just doing

18   a calculation of the average slope.  And then

19   taking -- if you look on the document, the data

20   book, it shows the same information calculated

21   by Excel and Mr. Johnson is apparently checking

22   it by hand to see if everything was working

23   right.

24             THE COURT:  He's adding up the

1    same numbers.

2                    MR. BARLOW:  That's right, Your

3    Honor, but it includes the data from the

4    testing.

5                    THE COURT:  Right.  All right.

6                    MR. FARABOW:  And, Your Honor, do

7    I understand that there is some indication in

8    1195 and 1196 that litigation is the purpose of

9    this?

10                   THE COURT:  No, I can't say that.

11   This is just -- in the other documents there is,

12   and what this appears to be is he put the

13   documents down and got a sheet of paper, and

14   just wrote the exact same numbers.  It has the

15   same information that's in the documents --

16                   MR. FARABOW:  But the other one

17   you just looked at, 1196, not this one, but the

18   other one, that does indicate a litigation

19   purpose?

20                   THE COURT:  It does.

21                   MR. FARABOW:  Thank you, sir.

22                   THE COURT:  And this is just his

23   sheet to recalculate on a sheet of paper.

24                   MR. FARABOW:  I understand, Your

1    Honor.

2                    THE COURT:  Okay.  1195.  Work

3    product.  And none of this is in this

4    litigation?

5                    MR. BARLOW:  None of this test

6    testing, right.

7                    THE COURT:  Right.

8                    MR. BARLOW:  That's right.

9                    The next document is another one,

10   another handwritten calculation based on a slope

11   of strain hardening study.

12                   THE COURT:  And this is Johnson.

13                   MR. BARLOW:  That's correct.  And

14   the numbers match up with the slope, the slope

15   of strain hardening testing as well as Ken

16   Reichek's work product data book.

17                   THE COURT:  All right.  1201 is

18   the exact same thing, Mr. Johnson's

19   recalculation on a plain sheet of paper, but

20   what he's taking the calculation from is

21   documents that intrinsically demonstrate that

22   they were prepared for litigation.

23                   MR. BARLOW:  All right.  The next

24   document is 844, and this is an example of the

1      deconvolution analysis.  And Mr. Johnson

2      explained in his declaration that deconvolution

3      analysis were used for infringement analysis

4      here, but were not used for competitive

5      assessment testing.

6                  And the supporting materials, the

7      first document is selected slides from a

8      PowerPoint presentation entitled Nova AST Patent

9      Enforcement, and it was presented by Mark

10     Johnson as well as Mike Glenn and Steve Krupp

11     who are attornies at Dow.

12                 And on the next page, there should

13     be highlighted the results, the final results of

14     the deconvolution analysis.  On slide number 22,

15     I believe it is.  And the way this slide ties up

16     to the first page of 844 is shown in the next

17     document, which is number 276, and that shows on

18     the first page the deconvolution analysis.  And

19     then the next page shows the basis for it, which

20     is identical to the first page of the 844.

21                 In addition, document 276, it has

22     -- no, it's just the identical page, it's got

23     the same legends, the same graphs and is the

24     same results.  So this is a deconvolution

1    analysis prepared for this meeting of Mike Glenn

2    and Steve Krupp and Mark Johnson participated

3    in.  Thank you.

4              MR. FARABOW:  I don't know what

5    the supporting documents show, Your Honor, so I

6    mean, I think that the way the document is

7    described, it does not indicate on its face that

8    it is work product.  You have other associated

9    documents that may or may not indicate that.  I

10   don't know how the dates compare.

11             THE COURT:  As I understand the

12   presentation, the document 844 is

13   contemporaneous to this Nova AST patent

14   enforcement presentation by Johnson, Krupp and

15   Glenn in May 3rd of 2004.

16             MR. BARLOW:  Well, it's quite a

17   bit earlier than that, but it was used to

18   present the slide on the deconvolution analysis

19   that was presented in May 2004.  It was also

20   presented earlier, in earlier infringements

21   presentations, which we can provide, but this

22   was the one --

23             THE COURT:  But it was used in

24   conjunction with 2004?

1          MR. BARLOW:  Yes, Your Honor.

2          MR. FARABOW:  But, Your Honor, if

3    you do a test in 2003 and then you decide in

4    2004 you're going to use it in a slide related

5    to an infringement analysis, that doesn't

6    necessarily prove when it was done it was done

7    for that purpose.  And as far as Mr. Johnson's

8    declaration is concerned, he's been wrong about

9    a lot of things, Your Honor.

10          THE COURT:  I'm going to look at

11   this.

12          MR. BARLOW:  Your Honor, we could

13   provide the slides from the earlier meeting to

14   show the same analysis.  I would also like to

15   point out that the analysis is not one that we

16   will be using in this case, and it relates to

17   patents not at issue here.

18          THE COURT:  Here is a little bit

19   of a problem in this presentation, you have it

20   there, and if you go to the second page, this

21   was -- I mean, I guess it's the first page, and

22   you see where it says -- has the cover sheet of

23   the patent enforcement, and has the name of the

24   three people I guess who prepared this, and you

1    go right below that, and it has -- you have a

2    box there, right lower corner, how do you

3    explain some of those topics?

4                    MR. BARLOW:  This was to give

5    audience background as to what the technology,

6    the Nova technology was that was at issue to

7    explain to the business people who were deciding

8    whether to pursue this --

9                    THE COURT:  Look at the third

10   bullet point.  This is Mr. Farabow's argument

11   about when you crossover and use what may have

12   been prepared for a patent infringement

13   analysis, but then you engage it, even in a

14   minimal way in a competitive analysis.

15                   MR. BARLOW:  Are you looking at

16   the lower, this one here?

17                   THE COURT:  No, to the right.

18                   MR. BARLOW:  Oh, to the right.

19                   THE COURT:  The third bullet.

20                   MR. BARLOW:  Right.  Your Honor,

21   that's referring to competitive assessment, that

22   statement, that's referring to what they're

23   doing.  And it's by way of introduction of the

24   last bullet point which is the patent

1    enforcement issue.  And then they launch into --

2              THE COURT:  See, it looks like

3    here that they're using this document -- I

4    understand what you're saying.

5              MR. BARLOW:  Wherever -- this kind

6    of information has been produced to them in

7    slide presentations where we -- where there was

8    both competitive assessment information

9    discussed as well as work product testing.  And

10   in those presentations we redacted out the work

11   product testing.  So this is information they

12   have, but it was also -- in other words, if

13   information was used for both purposes,

14   competitive assessment testing and infringement

15   analysis, we gave it to them.  If it was used

16   for one purpose only, then we withheld it.

17             THE COURT:  You withheld it,

18   right.

19             MR. BARLOW:  So this information

20   --

21             THE COURT:  You see on the red tab

22   page, and you go to -- I see what you have

23   outlined for me to look at, but you go to this

24   lower back.

1          MR. BARLOW:  Yes.  The overall

2     conclusions.

3          THE COURT:  I'm assuming -- right.

4     And then that's the conclusions of the paper.

5          MR. BARLOW:  Right.

6          THE COURT:  It looks like this is

7     a combined strategy of market strategy along

8     with patent enforcement strategy, and these

9     documents are part of that presentation.  They

10     may be utilized on the patent enforcement side,

11     but there sure looks like a mixed purpose here.

12          MR. BARLOW:  Well, the meeting was

13     for purposes of deciding the Nova patent

14     enforcement issue, and they referred to other

15     information they had.  It was also for

16     competitive assessment purposes, but anything

17     like that has been produced.  And I think this

18     slide, in fact, has been produced in other

19     presentations --

20          THE COURT:  You think they have

21     gotten this slide?

22          MR. BARLOW:  Either this slide

23     identically or in redacted form, but I think --

24          THE COURT:  Here what is I'm going

```
 1      to do, because I think this is problematic under

 2      my effort to be consistent here, so I'm going to

 3      order that if this document, 844, it's only

 4      really one slide, I mean, it's got multiple

 5      variations, I think, if it's already been given

 6      over, somehow be able to make that

 7      representation.  If it hasn't, then I'm going to

 8      order 844 -- I'm going to find this not work

 9      product, it's got a mixed use with Dow, and

10      therefore, should be provided.  And if it's

11      already gone over, then it's already gone over.

12      Again, it doesn't look like it's going to be

13      part of this litigation.

14                  MR. BARLOW:  It won't be.

15                  THE COURT:  But Mr. Farabow can

16      read it on the train, give him something to do

17      looking at those charts.

18                  MR. FARABOW:  Thank you, Your

19      Honor.

20                  MR. BARLOW:  The next document is

21      1849, and this is a much older document.  It's

22      from the 1990s.  And it relates to potential

23      infringement litigation against Exxon, not Nova.

24      And the document itself is from Mark Johnson to
```

1          three Dow personnel about testing related to the

2          subject is Ticheng characterization, and what we

3          have included in the supporting documents are

4          related E-mails that some have the same subject,

5          they all have -- they all involve the same

6          people, Georgia Huff, Al Parrott, Larry Kale,

7          Rajen Patel, but they also involve attornies

8          such as Glenn, Korvitch, Steve Krupp, Charles

9          Kaliel who are all in-house attorneys at Dow.

10                    If you look at the third to the

11          last page, it refers to efforts to fractionate

12          and test Exxon's Exceed to determine if it

13          infringes claims of -- this is an internal Dow

14          designation for one of its patents.

15                    And then the E-mail chain

16          continues and Mr. Johnson sets up a meeting

17          around August 26 to discuss this with Georgia

18          Huff, Al Parrott, Rajen Patel, Larry Kale as

19          well as others, including attorney Steve Krupp,

20          and then two days later, it is the subject of

21          document, privilege document 1849 where

22          Mr. Johnson summarizes what happened at the

23          meeting and says that Larry is going to do

24          certain things and Al is going to do certain

1    things and Georgia is going to do something.

2              And then finally there is a

3    document in the supporting materials, the last

4    one which is the next week, it's also sent to

5    attorneys including Steve Krupp, and it says the

6    first item that Larry has done what he was

7    supposed to do in 1849, and in item number four

8    says that Al is going -- it repeats that Al is

9    going to do one of the types of tests that 1849

10   says he was going to do.  So we think these

11   documents clearly tie up 1849 to testing related

12   to determining whether Exxon infringed Dow

13   patents.

14              THE COURT:  Mr. Farabow.

15              MR. FARABOW:  Your Honor, we just

16   have the description of this one document which

17   doesn't refer to any attorney, and you have now

18   a chain of E-mail.  We know that Dow was testing

19   Exxon products for competitive purposes.  If

20   this is a mix use testing, then it should be

21   produced.  If it's just litigation, then it's

22   just litigation.

23              THE COURT:  All right.

24              MR. BARLOW:  Your Honor, the

1    document itself, 1849, does not -- is not to or

2    from an attorney, but it was marked attorney

3    work product contemporaneously with its

4    creation, and it relates to the identical

5    testing discussed in documents that are sent to

6    and from attorneys.

7             THE COURT:  The document, 1849,

8    doesn't itself other than its subject matter

9    description and the fact that it's stamped as

10   attorney work product, it just basically talks

11   about what has to be done to get some testing

12   accomplished.  It's dated August 28th, 1997 and

13   it ends up with they're going to meet around

14   Thursday afternoon.

15             Then you go to September 5th of

16   '97, and it's clear that the August 28th memo

17   has now been acted upon and that memo clearly

18   indicates that what was discussed in the August

19   28th memo was for purpose of litigation.

20             And then they're talking about

21   reviewing the progress and get together on the

22   Thursday afternoon again and then you move on to

23   the other E-mails and it's clear that the August

24   28th was in combination -- what was requested

1    there was in combination with these other

2    E-mails that clearly are describing meetings and

3    results all for the purpose of suing Exxon for

4    patent infringement.  Did they get sued.

5              MR. BARLOW:  I think, Your Honor,

6    there were other litigations going and Exxon and

7    Dow settled before this one got started.

8              THE COURT:  Okay.  So 1849 based

9    on its relationship to other documents that

10   clearly indicate internally that they were for

11   litigation purposes is found to be covered by

12   the work product privilege.

13             MR. BARLOW:  The next document is

14   1630, and it is a copy of another document which

15   is in the supporting materials, or a copy of a

16   page of another document, which is 1245.  And it

17   refers to -- 1245 includes both the subject of

18   1630 as well as a fraction test on a fraction of

19   Nova's polymers.

20             And further information about the

21   subject of this document is shown in some

22   meeting minutes between -- meeting minutes

23   involving Steve Bulk who is the consulting

24   expert Dow retained to look at the testing to

1    get ready for this litigation.  And in the

2    meeting minutes, Dr. Bulk wants Dow to look at

3    the 1378 CM minus one wavelength for methyl, and

4    if you look in the copy at 1630 that is in 1245,

5    the next 1338 CM minus one is written there.

6                THE COURT:  I got the two, explain

7    that to me again.

8                MR. BARLOW:  Sure.  There is 1630,

9    that's the document in question, it's a single

10   page document.

11               THE COURT:  Right.

12               MR. BARLOW:  But it's part of --

13   it is also part of 1245.

14               THE COURT:  Right.

15               MR. BARLOW:  Which is a two-page

16   document.

17               THE COURT:  Right.

18               MR. BARLOW:  And 1245, the first

19   page has this handwritten note about this

20   specific wavelength, and then the relevance of

21   the wavelength and the analysis to the

22   litigation is shown by the second set of meeting

23   minutes which is document 982.  And that shows

24   that they were looking at the 1378 wavelength

1    for methyl.  And the next page shows that as

2    well.

3              And finally 1245, which is the

4    two-page document also includes analysis of a

5    document, of a sample with a LIMS number that

6    comes right out of one of Ken Reichek's data

7    books, and one of his attorney/client work

8    product data books.  So this single page test

9    result is tied up to the work product testing

10   through that chain of documents.

11             THE COURT:  Tell me what this

12   document reports again.

13             MR. BARLOW:  It's reporting an

14   analysis.  They were looking for -- they were

15   trying to resolve an issue regarding

16   calibration.  And they did this test at Steve

17   Bulk's request to try to get at that issue.  And

18   the one page we have on 1630 doesn't have any

19   information on it that ties itself to the work

20   product setting.

21             But the first document we have

22   included in the supporting materials, number

23   1245 shows that what they were looking for was

24   this wavelength for this calibration issue.  And

1    this is really an issue about impurity they had

2    identified in some of the fractions, and they

3    were trying to figure out what it was.  So it

4    certainly is not testing we're going to be using

5    in this litigation, it was a problem that was

6    found and resolved.

7               THE COURT:  And I agree that it's

8    testing with regard to a problem.  Again,

9    because there is some other references here in

10   the supporting documents, I'm going to -- and

11   there is listed in some of the supporting

12   documents, there is a listing of competitive

13   products, there is some comparison, so I'm going

14   to find it's been given a mixed use by Dow, so

15   Document 1630 and find that it's not privileged.

16              I don't know what use it's going

17   to be in this case, it's hard to make sense out

18   of it with all the explanation, but I'll order

19   it given over.

20              MR. FARABOW:  Thank you, Your

21   Honor.

22              MR. BARLOW:  Okay.

23              1786 is an Excel spreadsheet

24   containing an analysis relating to slope of

1          strain hardening.  And the supporting documents

2          show that in discussions with Steve Bulk, the

3          consulting expert, there was a discussion of

4          doing a particular kind of correction that's

5          referred to on the first page at the top and

6          also at the bottom.

7                      And there is another document that

8          Mr. Johnson stamped attorney work product that

9          also talks about this type of correction.  And

10         then if you look in the legend in the document

11         1786, it refers to the same type of correction

12         calling it an adjustment in this case.

13                      So this is a way of -- this is an

14         analysis of the data conducted based on Steve

15         Bulk's suggestion, and as part of an analyzing

16         the Nova infringement testing.

17                      MR. FARABOW:  It sounds like a

18         research purpose to me, Your Honor.  I don't

19         hear anything about infringement litigation.

20         And we have shown that they use this slope of

21         strain hardening for commercial evaluation.

22                      So I leave it to Your Honor to see

23         if there is anything about litigation in there.

24         Certainly it could easily be a mixed purpose if

1    not solely a competitive analysis document.

2                    MR. BARLOW:  Your Honor, Steve

3    Bulk was specifically retained to look at the

4    testing on the Nova products in consultation

5    with Dow in preparation for litigation.  And his

6    meetings with Mark Johnson were for that

7    purpose.  And the documents that refer to

8    privilege document 1786 are meeting notes with

9    Steve Bulk and mention the exact types of

10   analysis that they're looking at.  It relates to

11   SSH which is an issue in the case.

12                   THE COURT:  It's clear, this

13   document is -- well, the supporting documents

14   that relate to this document are clearly the

15   subject matter of them is about litigation, and

16   specific litigation has the patent numbers that

17   they're -- but what I'm trying to understand

18   about this --

19                   MR. BARLOW:  Your Honor, it also

20   discusses -- the Steve Bulk meeting minutes

21   discuss curb fitting and the ways to do that.

22   And another thing that's shown on the first page

23   of 1786 which is different fits to the data.

24                   THE COURT:  What's peak Treff?

1              MR. BARLOW:  That's a

2      fractionation technique.  That is a large scale

3      fractionation technique that allows you to

4      collect samples.

5              MR. FARABOW:  Large samples that

6      no other equipment can collect, Your Honor,

7      other than this large machine at Dow.

8              MR. BARLOW:  It's actually a

9      well-known technique, well-known in the art,

10     Your Honor.

11             THE COURT:  They're working

12     through problems in their analysis here.  And I

13     don't know much about that machine.  I can't

14     wait to hear a lot about it.  But they already

15     have some data which is this and it sounds like

16     they're trying to get the data correct to assert

17     the patents or to be prepared for litigation.

18     It's all about data prep.

19             MR. BARLOW:  That's right, Your

20     Honor.

21             THE COURT:  There is no

22     comparisons being made here, it's all about

23     preparing data from what I can read.  And

24     Mr. Farabow's going to get that machine on his

1    side of this case, he's working hard for it.

2    1786 is work product, internally demonstrates

3    that it's preparation of data for litigation.

4              MR. BARLOW:  2325 is closely

5    related to the one we just looked at.  It

6    includes -- it's a precursor to the spreadsheet

7    we just looked at.  It includes half the data in

8    that spreadsheet, and it doesn't have all of it

9    yet, but it was something collected for the

10   process of doing the analysis.

11             And if you look at the two pages I

12   have tabbed in blue, you can see that the data

13   are identical.  The one on the left is the

14   document --

15             THE COURT:  I agree, you don't

16   have to go through it.  This is basically

17   another spreadsheet utilizing the same support

18   documents which I've already made a finding on

19   that they were data in preparation of

20   litigation, and just has another reference to

21   this information.  And also how they're going to

22   get better information for litigation.

23             MR. BARLOW:  The next one, 1155,

24   is also related.  It's a hard copy printout of

1    the first page of the document we just looked at

2    as well as printouts from another document.

3                    Now, all except the first page of

4    1155 are printouts of a document that we have

5    provided to Nova, and that's included in the

6    supporting materials.  But they contain the

7    notes of Mr. Johnson that he put on the document

8    in getting ready to do the analysis, he talked

9    to Dr. Bulk about the analysis that was in the

10   two documents we just looked at.  But the first

11   page is a printout of Document Number 2325 which

12   we just looked at.

13                   THE COURT:  So the only difference

14   is the notes?

15                   MR. BARLOW:  Well, the difference

16   is the notes, and that it includes other pages.

17                   THE COURT:  Right.

18                   MR. BARLOW:  But the pages without

19   the notes have been produced to Nova, and that's

20   shown in the supporting materials, the yellow

21   tabs.

22                   THE COURT:  So the first sheet is

23   what is really making this different because you

24   produced the underlying data.

1           MR. BARLOW:  We have produced the

2    pages behind the first sheet without the notes

3    on them.  And then so the first sheet makes a

4    big difference, but the notes show an analysis

5    of the data that hadn't been done before, and

6    this analysis was done solely for litigation.

7           THE COURT:  So basically you're

8    trying to protect the spreadsheet again?

9           MR. BARLOW:  Yes, that's right.

10          THE COURT:  And again given over

11   this because it came -- the spreadsheets were

12   prepared for litigation with the lawyers and

13   this data was already available because it had a

14   cross competitive purpose.

15          MR. BARLOW:  No, the first page of

16   the document, that's purely -- the data in there

17   is purely created for the litigation.

18          THE COURT:  You didn't give that

19   to them?

20          MR. BARLOW:  Right.

21          THE COURT:  And that's what we

22   have seen before.

23          MR. BARLOW:  Right.

24          THE COURT:  This one has an

1     enhancement of notes on it.

2                     MR. BARLOW:  That's right.

3                     THE COURT:  Handwritten notes.

4                     MR. BARLOW:  That's right.

5                     THE COURT:  But what's under it

6     could have -- I haven't seen this before, but it

7     could have a cross purpose, but they already

8     have these.

9                     MR. BARLOW:  They already have

10    what's under it.

11                    THE COURT:  Right.  I got it.

12                    MR. FARABOW:  I gather, Your

13    Honor, however, that we do not have his notes on

14    the underlying document.  If the underlying

15    document is a commercial document, then the

16    notes must be commercial notes.

17                    THE COURT:  There is no notes on

18    this.

19                    MR. FARABOW:  Oh, okay.

20                    THE COURT:  No.  No.  They took

21    those tests and the documents and then they

22    created their own spreadsheet to make

23    comparisons of the various tests.  On that

24    spreadsheet he made his notes because they're

 talking about a lawsuit. On the underlining documents he didn't make any notes on the underlying documents that you already got.

MR. FARABOW: I'm sorry, I misunderstood, Your Honor.

THE COURT: Right. All right. 1155 is found to be privileged.

You know, as you look at these, I see young lawyers sitting around, what a great future, never going to be out of work, this patent litigation. Look what Roper and Farabow created for you.

When I came to the bench, we had like fifteen patent cases and a huge workload. And you folks are probably in a few cases now. It's a cottage industry. It's amazing what you have done. Congratulations. All you young lawyers ought to be real happy with them.

They're probably going to be looking, what are they doing, they look for residuals, they'll probably walk out the door looking for residuals.

MR. FARABOW: Thank you, Your Honor.

1                    MR. ROPER:  We haven't figured

 2      that one out, though.

 3                    THE COURT:  You took very

 4      straightforward patent issues and made it into a

 5      litigation boom.  It's beautiful.  And having

 6      sat here and seen it when we were all a lot

 7      younger.  When you read this stuff, I mean, this

 8      litigation thing has -- I can remember early on,

 9      you never see any of this stuff where they now

10      kick it into like it's asserting patents like

11      seriously.

12                    I mean, people when you were here

13      with the twelve, somebody trying to get a little

14      money, you had polypropylene and all that stuff,

15      it was more straightforward.  So I hope all you

16      young lawyers appreciate it.  You ought to be

17      buying them dinner, lunches, giving up some of

18      that bonus money.

19                    All right.  806.

20                    MR. BARLOW:  806 is a document for

21      testing of a particular -- they're looking for a

22      specific features that are highlighted, and this

23      is -- these are features that are in a Dow

24      patent included in the supporting materials that

1      is not asserted here.  They're also highlighted

2      in the claims of the Dow patent.

3                  And there is also a note, a

4      handwritten note from Mark Johnson also

5      referring to this unasserted Dow patent, and

6      mentioning the same features they were looking

7      for in the polymer that the privilege document

8      806 refers to.

9                  THE COURT:  You got that big

10     machine here again, Mr. Farabow.

11                 MR. FARABOW:  Your Honor, the only

12     thing I would point out is that in Nova Exhibit

13     2, there are a lot of features that are in the

14     claims that are analyzed for purposes other than

15     patent litigation.  I don't think the fact that

16     they have enumerated things like melt index or

17     whatever in there really makes it a litigation

18     motive, unless they're talking about patent

19     claims.  I mean, he can't attach a patent that

20     has --

21                 THE COURT:  I think what they're

22     doing, they're sending them back to get better

23     information or refined information for patent

24     litigation.  Is that a fair explanation of this?

1          MR. BARLOW:  Yes.

2          THE COURT:  And they're using your

3     machine in part.  You're going to have to buy

4     one of those.

5          MR. FARABOW:  I don't think there

6     is but one.

7          THE COURT:  I don't think you're

8     going to get one.  I think I described them and

9     I find them as work product.  806.

10          MR. BARLOW:  Next one is 57.  And

11     it is a document that contains a reference to a

12     type of testing we did, and then a type of

13     follow-up testing below that next to unknown

14     identification.  And this type of testing is

15     fractionation testing, it's not the competitive

16     assessment purposes.

17          And the follow -- the supporting

18     materials show that in early '04, early 2004 as

19     a result of a meeting with Jenkins & Gilcrest,

20     Dow is requested to repeat this specific type of

21     testing on this specific grade of Surpass with

22     --

23          THE COURT:  Right.  I mean, this

24     is real clear.  This is a repeat of a sample of

1    a Nova Surpass they want to Treff.  This is

2    clearly a retest to refine against your product,

3    the 900-C, for purposes of litigation which is

4    backed up by the cover memo.  It's all they're

5    doing is retesting to target your product.  I

6    think 57, I find 57 is privileged.

7                 MR. BARLOW:  The next document is

8    1468, a PowerPoint presentation that was

9    prepared to teach the lawyers at Jenkins &

10   Gilcrest about some of the fractionation

11   techniques being used.  The supporting document

12   is the excerpts from the full Jenkins & Gilcrest

13   presentation that include the slides in 1468.

14                 THE COURT:  This is clearly a

15   tutorial for lawyers in litigation, 1468.  The

16   document itself without supporting documents is

17   clear that the document's purpose is to educate

18   the lawyers on the test.

19                 MR. BARLOW:  The next document is,

20   it says on it 9302.  This is document 839.  But

21   it's clearly not 9302, it number 9303, because

22   it's referring to parts of Nova's product, and

23   looking at some of the issues, the splits

24   between the two reactors that Dow is looking at

1    for examining infringement.  And the supporting

2    materials show that around this time, the day

3    before, there was another meeting where there

4    was a discussion of cross fractionation and

5    different types of fractionation testing with

6    respect to the Nova, the Nova products.

7              And this is a continuation of that

8    meeting where they were looking at how to divide

9    the product up into its parts that were made in

10   each reactor.  And it talks about some of the

11   follow-up work that is going to be done.

12             MR. FARABOW:  Judge, that's

13   exactly what they were reevaluating for a

14   competitive analysis.  They were trying to

15   determine how they could improve their product.

16   They were trying to determine whether Nova would

17   compete effectively with them in the market.

18   They wanted to know how Nova made the product.

19   And I didn't hear anything about litigation in

20   any of that.

21             THE COURT:  Well, I can tell you a

22   little phrase here, enough to infringe.  All

23   this analysis of your product they have it right

24   here, this document supplements this document,

1    and internal to the document what they're

2    analyzing if there was -- I'm not going to tell

3    you too much, but they're talking about your

4    product.

5                 MR. FARABOW:  If there is enough.

6                 THE COURT:  If there is enough,

7    they haven't made a decision yet, but it's clear

8    that this is -- that's the summary of what

9    they're doing, they're trying to determine if

10   they have enough to -- I guess their prefiling

11   investigation to establish infringement against

12   your product.

13                MR. FARABOW:  They're not also

14   talking about how good it's going to be, are

15   they, Your Honor?

16                THE COURT:  I'm not going to get

17   into that.

18                MR. FARABOW:  No, I mean how good

19   it's going to be commercially is what I meant to

20   say.

21                THE COURT:  No, they're talking

22   about fractionation, and the samples they have

23   and then if there is enough of a certain aspect

24   to be able to establish infringement.  That's

1    what they're talking about.  And they're saying

2    if Nova hires Farabow, so I'm not going to get

3    into that.

4              MR. FARABOW:  Thank you, Your

5    Honor.

6              THE COURT:  839 is clearly

7    intrinsic in the document that's in preparation

8    of litigation.

9              MR. BARLOW:  I think we only have

10   two more documents, Your Honor.

11             THE COURT:  I can make a decision

12   on this one because of what I have seen.  2216

13   is protected by work product.

14             MR. BARLOW:  The next document,

15   2003, is a result of a type of fractionation

16   that was requested as the supporting documents

17   show, in the last document is an E-mail from

18   Mark Johnson to Bruce Kanuck who is an in-house

19   attorney at Harry Roper.

20             And item two says did a search of

21   recent and then it mentions this type of

22   fractionation analysis.  And then just to show

23   you that fractionation analysis is what it looks

24   like, the second page of the first document in

1    the supporting materials shows a typical output.

2    And if you look at the third page of 2003, it

3    shows the same type of thing.

4               So this was documents -- this was

5    fractionation testing looking at these polymers

6    that was in response to the E-mail from Mark

7    Johnson to Bruce Kanuck and Harry Roper.

8               THE COURT:  All right.  Document

9    2003 is the document itself was requested and

10   then delivered to counsel, and it's clearly

11   litigation counsel.  And this document is

12   submitted as a follow-up to meetings with

13   counsel and where counsel requested the

14   information, and have a lot of other matters

15   they were following up on for the litigation.

16               MR. FARABOW:  Your Honor, could I

17   ask a question?

18               THE COURT:  Sure.

19               MR. FARABOW:  The document is

20   dated I believe August of 2003, and Mr. Roper

21   must have asked for it in 2000 at least five,

22   two years later.

23               THE COURT:  Actually, this is a

24   2000 -- they're following up on Chicago meetings

1    and the document, the E-mail that is -- there is

2    a whole host of things here about litigation.

3    It's a 2004 document.

4              MR. FARABOW:  My privilege log

5    shows that this document number 2003.

6              THE COURT:  Oh, 2003.

7              MR. BARLOW:  That's correct.

8              THE COURT:  Yes, that's --

9              MR. BARLOW:  It does say in the

10   privilege log that it was in 2003.  It could be

11   that we put in the date the document was created

12   as opposed to when it was saved.

13             THE COURT:  But it was delivered

14   in 2004?

15             MR. BARLOW:  Yes.

16             THE COURT:  After these meetings?

17             MR. BARLOW:  Right.  Or '05,

18   maybe.  That's correct.

19             THE COURT:  It says -- I mean, you

20   know, actually this is December 2004, and it

21   talks about recent cross fractionation analysis.

22             MR. BARLOW:  That's right.

23             MR. FARABOW:  Well, the document

24   that we are interested in getting is the one

1    from August 2003, which is said to be

2    thirty-nine pages long in the -- I mean, they

3    may have decided later to use it for litigation

4    purposes, but was it originally generated in

5    August 2003 for litigation purposes.

6              MR. BARLOW:  Your Honor, could I

7    -- can we go back and check whether this

8    document was indeed last saved after 2004, and

9    if it is indeed a document from 2003, then we

10   will produce that.

11             THE COURT:  Then you will provide

12   it?

13             MR. BARLOW:  Yes, we will do that.

14             THE COURT:  The date will be

15   important.  I was assuming that it was because

16   of the discussion in the E-mail, and some of the

17   attachments, which again appear to be refined

18   chartings.  Actually there is even reference to

19   a test here.  You'll have to sort this out.  If

20   this isn't contemporaneous with the Roper

21   conversation, this document will have to go

22   over, whether it's that earlier one or 2003.

23             MR. BARLOW:  Thank you.

24             MR. FARABOW:  Thank you, Your

1     Honor.

2                 THE COURT:  So I'm going to

3     reserve decision on 2003 and then if it's

4     resolved --

5                 MR. BARLOW:  Should we just advise

6     the Court.

7                 THE COURT:  As long as Mr. Farabow

8     doesn't get back to me.

9                 MR. BARLOW:  I believe this is the

10    last document.  This is document 1034.  And

11    these are a notes that Mr. Johnson took on a

12    slide.  The slide itself has been produced to

13    the other side in various forms, but the

14    handwritten notes were placed on the slide

15    during a meeting with Jenner & Block in which

16    Mr. Johnson was trying to explain certain

17    aspects of the invention to the attorneys.

18                THE COURT:  You can tell this

19    document is in a meeting with -- it's marked up

20    for purposes of litigation.  I don't think you

21    have to say anymore.  And you're telling me that

22    the document itself was given over?

23                MR. BARLOW:  That's right.

24                THE COURT:  And this is the

1    handwritten -- this is the document with the

2    handwritten notes?

3              MR. BARLOW:  Yes.

4              THE COURT:  Presented to

5    attorneys, which it appears from itself to have

6    been that.

7              MR. BARLOW:  That's right.  The

8    underlying documents have been provided in

9    various forms.

10             THE COURT:  So 1034 is privileged.

11   I checked, Mr. Farabow, he doesn't mention you

12   on this one.

13             MR. ROPER:  That's all thirty of

14   them, Your Honor.

15             MR. FARABOW:  Your Honor, we

16   really appreciate your patience in going through

17   these documents like this.  And sorry we put you

18   to this expenditure of time.

19             THE COURT:  No problem.  It's

20   always a pleasure to see you and Mr. Roper.

21             MR. FARABOW:  Thank you, sir.  In

22   view of the Court's rulings, I don't think this

23   is probably an appropriate time, but I wanted to

24   tell the Court that we do want to consider

1    renewing our motion on the grounds of need in

2    view of the Court's rulings and in view of the

3    big machine that we've talked about, and other

4    factors.

5                    Additionally, if they want to use

6    fraction or fractionation evidence later, we

7    want to object that they need to produce these

8    documents if they're going to use fractionation

9    evidence in trying to prove infringement.  And

10   --

11                   THE COURT:  I don't think they're

12   going to, but at this juncture, you don't plan

13   to, do you?

14                   MR. BARLOW:  Not this kind of

15   fractionation.  We may have to divide the

16   polymer in half, but not that fractionation.

17                   THE COURT:  Not that.

18                   MR. BARLOW:  That's right.

19                   THE COURT:  If you do, you'll then

20   provide to Mr. Farabow.

21                   MR. BARLOW:  That's right.

22                   THE COURT:  When you see what's in

23   these documents, then you won't use them, I

24   don't think.  It's lot of stuff in there.

 1               MR. FARABOW:  Your Honor, I think

 2       it might contradict what they do use.

 3               THE COURT:  I don't think so.  I

 4       don't even think they get the test right.

 5               MR. FARABOW:  The other point is I

 6       raised with Mr. Roper before the hearing today

 7       that we believe we need a couple of extra months

 8       in the schedule to get through fact discovery.

 9       We have a lot of witnesses, documents that come

10       sort of late because of this controversy that

11       we've had and because of the documents that were

12       produced to us after the last hearing that we

13       had, and he and I agreed to talk about that and

14       we may ask the Court for a couple more months to

15       get through fact discovery.

16               THE COURT:  Whatever you need to

17       do, we'll go along with.

18               MR. FARABOW:  Thank you, sir.

19               THE COURT:  I'm sure you'll both

20       be reasonable with each other and get it worked

21       out.

22               MR. ROPER:  As Mr. Farabow said,

23       we agree to talk to see what impact any

24       agreement may or may not have on the remaining

1    aspect of the schedule.

2              THE COURT:  And we can address

3    that once you get your discovery time figured

4    out.

5              MR. ROPER:  Okay.  Good.

6              THE COURT:  And we can work the

7    rest of it out for you.

8              MR. FARABOW:  Thank you, Your

9    Honor.

10             MR. HORWITZ:  Your Honor, one

11   question.  If we do decide to go forward with a

12   motion based on need, should we do that separate

13   from your nondispositive motion practice or is

14   it a carry on to this so that we would schedule

15   it separately.

16             THE COURT:  You know, I'm getting

17   myself in trouble with my staff because like I

18   take things out like this, and I'm not a

19   complainer, but now I think I'm assigned 76

20   patent cases and two NVLs, and I'm attention

21   deficit disorder, and older.  I think it's

22   better if we at least notice it to a motion day

23   so they can keep everything -- I mean, it's an

24   unbelievable amount of paper on the staff.  So I

1    think I'm going to just keep it, bring that

2    motion and notice it.

3              Now, whether I hear it on a motion

4    day depending on its volume will be another

5    matter, but that way we'll be insured it's

6    noticed and when I see it, I'll recall it comes

7    from this.  And I might take it out then, but I

8    rather notice it so we keep a consistency of

9    things being presented in a patent case.

10              MR. FARABOW:  Thank you, Your

11   Honor.

12              MR. ROPER:  Your Honor, we should

13   probably meet and confer on this issue as well.

14              THE COURT:  Maybe it will go away.

15              MR. FARABOW:  Maybe it will, Your

16   Honor.

17              THE COURT:  All right.  Anything

18   else we can help you with today?

19              All right.  Have a good weekend.

20              (Court recessed at 1:35 p.m.)

21

22

23

24

1    State of Delaware    )
                          )
2    New Castle County    )

3

4                    CERTIFICATE OF REPORTER

5

6

          I, Dale C. Hawkins, Registered Merit
7    Reporter and Notary Public, do hereby certify that
     the foregoing record is a true and accurate
8    transcript of my stenographic notes taken on June 6,
     2008, in the above-captioned matter.
9
          IN WITNESS WHEREOF, I have hereunto set my
10   hand and seal this 9th day of June, 2008, at
     Wilmington.
11

12   _____
                    Dale C. Hawkins, RMR
13

14

15

16

17

18

19

20

21

22

23

24