<pre>
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     THE DOW CHEMICAL COMPANY,
 4                                            : CIVIL ACTION
                     Plaintiff,               :
 5                                            :
                           v.                 :
 6                                            :
     NOVA CHEMICALS CORPORATION (CANADA),     :
 7   and NOVA CHEMICALS, INC. (DELAWARE),     :
                                              : NO. 05-737-LPS
 8                   Defendants.
                                  - - -
 9
                           Wilmington, Delaware
10                         Friday, April 12, 2013
                           Pretrial Conference
11
                                  - - -
12
     BEFORE:          HONORABLE LEONARD P. STARK, U.S.D.C.J.
13
     APPEARANCES:                       - - -
14

15            MORRIS NICHOLS ARSHT & TUNNELL, LLP
              BY:  RODGER D. SMITH, II, ESQ.
16
                      and
17
              JENNER & BLOCK, LLP
18            BY:  HARRY J. ROPER, ESQ., and
                   PAUL D. MARGOLIS, ESQ.
19                 (Chicago, Illinois)

20                    and

21            QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
              BY:  RAYMOND N. NIMROD, ESQ., and
22                 JOSHUA S. REISBERG, ESQ.
                   (New York, New York)
23
                      Counsel on behalf of The Dow Chemical Company
24

25                                    Brian P. Gaffigan
                                      Registered Merit Reporter
</pre>

1   APPEARANCES:   (Continued)

2

3                       POTTER, ANDERSON & CORROON, LLP
                        BY:  DAVID E. MOORE, ESQ.

4                             and

5                       FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
                        BY:  MARK J. FELDSTEIN, ESQ.,

6                            SULAY D. JHAVERI, ESQ., and
                             ERIC J. FUES, ESQ.

7                            (Washington, District of Columbia)

8                               Counsel on behalf of Nova Chemicals
                                Corporation and Nova Chemicals Inc.

9

10

11

12

13

14

15

16                              - oOo -

17                       P R O C E E D I N G S

18                  (REPORTER'S NOTE:  The following pretrial

19   conference was held in open court, beginning at 3:24 p.m.)

20                  THE COURT:  Good afternoon.

21                  (The attorneys respond, "Good afternoon, Your

22   Honor.")

23                  THE COURT:  Welcome to Judge Burke's courtroom.

24   Let me have you put your appearances on the record for me,

25   please.

 1            MR. SMITH:  Good afternoon, Your Honor.  Rodger

 2   Smith for Dow Chemical.  With me today are Harry Roper from

 3   Jenner & Block, Ray Nimrod from Quinn Emanuel.  In the back

 4   row, Paul Margolis from Jenner & Block, and Josh Reisberg

 5   from Quinn Emanuel.

 6            THE COURT:  Okay.  Welcome.

 7            MR. MOORE:  Good afternoon, Your Honor.  David

 8   Moore from Potter Anderson on behalf of Nova.

 9            THE COURT:  Good afternoon.

10            MR. MOORE:  With me today from Finnegan

11   Henderson are Mark Feldstein, Eric Fues, and Sulay Jhaveri.

12            THE COURT:  Welcome to you as well.

13            So we're here for the pretrial conference.

14   Trial will not be in this courtroom.  It will be in my

15   regular courtroom.  As you may or may not have seen, we

16   have got things rearranged in there.  I have a two week

17   prisoner civil rights trial beginning on Monday and we're

18   still moving furniture and equipment around to accommodate

19   the various challenges of that case.  That is why we're

20   here.

21            My agenda for today is I'll hear brief argument

22   on the motion to stay and then we'll have argument briefly

23   on the motions in limine.  After that, we may take a

24   short break but we will also talk about a few other

25   matters about the pretrial order and some of the mechanics

1    of trial.

2              We do first have the motion to stay, and I will

3    hear briefly if you wish to add anything to what you have

4    written.

5              MR. FELDSTEIN:  Your Honor, Mark Feldstein from

6    Finnegan.

7              I think our motion is fairly self-explanatory

8    and our briefs are just from yesterday or the day before, so

9    we don't have any new issues to add.

10              I think as we lay out, the primary question or

11    the primary factor, as Your Honor has recognized before, is

12    prejudice in granting the stay.  The prejudice and risk to

13    Nova here is substantial in that we may get dinged for

14    damages when the patent is later found invalid that

15    potentially are unrecoverable, and as we laid out, and I

16    don't think Dow really has a basis to contest given the

17    patents are invalid, I mean, excuse me, expired.  And that

18    the only question is past damages.  There is really no

19    prejudice here to Dow.

20              THE COURT:  Your alternative request is that I

21    agree to stay entry of judgment; correct?

22              MR. FELDSTEIN:  Correct, Your Honor.

23              THE COURT:  If I am not inclined to stay the

24    trial, do you think I need to decide now whether to stay

25    entry of judgment or is that a matter I can kick down the

1  road?

2          MR. FELDSTEIN:  I think you can kick down the

3  road, if you so choose.

4          THE COURT:  And your position at trial on

5  damages, are you going to argue that there is a basis on

6  which I could find zero supplemental damages or is it

7  something greater than zero?

8          MR. FELDSTEIN:  Something greater than zero,

9  Your Honor.  The floor is a reasonable royalty that Dow

10 would be entitled to.  But the point is that if the patent

11 is later found invalid, then there weren't damages on an

12 invalid patent.  That is why it is tough for the judgment

13 when there is the open question out there before the Patent

14 Office.

15         THE COURT:  Although you are not arguing, as I

16 understand it, that you have any basis to try and undo the

17 damages you have already paid?

18         MR. FELDSTEIN:  Correct.  We are not trying to

19 undo those stage damages, Your Honor.

20         THE COURT:  So what is the distinction legally

21 between the damages that you say you are going to have to --

22 the nonzero damages that I am going to have to at least

23 award and the $76 or so million that you already paid

24 before?

25         MR. FELDSTEIN:  The Patent Office decision,

1   as I understand the law, Your Honor, can't undo a final

2   executed judgment.  It is basically the separation between

3   administrative branch decision, the Patent Office, and the

4   judicial decision finding that there were a final judgment

5   on damages.  That's why we don't want there to be a final

6   judgment on damages for the supplemental phase, because if

7   the patent is invalid, then there wouldn't have been any

8   patent to have damages on.

9              So the difference is that the judgment that we

10  paid previously is final and executed.  There is no final,

11  executed -- there is no judgment whatsoever for the

12  supplemental damages period.  If there is a judgment, it

13  will be nonzero, but there is no judgment and that is the

14  distinction.

15             THE COURT:  Is it true that the prior art

16  references on which the current reexam is based were known

17  to Nova and your experts prior to the 2010 trial?

18             MR. FELDSTEIN:  The prior art was of record,

19  Your Honor.  Yes, Your Honor.  And as we pointed out, the

20  reexam was based on additional information that the Patent

21  Office didn't have in granting the patent in the first

22  place.  Those are positions and representations Dow made

23  at trial and its documents that are now public that the

24  Patent Office was unable to consider when they first

25  evaluated the patents.

1          THE COURT:  The Patent Office was unable to

2    consider it, but did anything prevent Nova from bringing it

3    to the Patent Office's office attention prior to now?

4          MR. FELDSTEIN:  Nothing prevented us subsequent

5    to the trial.  We couldn't have done it before the trial

6    when the documents became public.

7          THE COURT:  But you could have done it closer to

8    2010?

9          MR. FELDSTEIN:  That's true, Your Honor.

10          THE COURT:  Do you disagree that the reexam is

11    likely to take about two years to complete?

12          MR. FELDSTEIN:  Only if they find the patent

13    invalid.  It is ex parte so Nova won't be participating in

14    the reexam, and if Dow is able to convince the examiner in the

15    first instance that there is no valid grounds for rejection,

16    then it could be over very quickly in Dow's favor.  The only

17    way it is going to take a lot of time is if the Patent Office

18    is unpersuaded that the patent is valid and finds the patent

19    invalid.

20          THE COURT:  Thank you.  I will give Dow a chance

21    to respond.

22          MR. ROPER:  Good afternoon, Your Honor.  Harry

23    Roper.

24          THE COURT:  Good afternoon.

25          MR. ROPER:  Yes, we got their reply brief.  I

1     think there are a couple of points that I think kind of

2     settled in as we read all these briefs.  One of the things

3     that really occurred to me looking at all of these cases

4     that are cited in the cases before Your Honor, there was no

5     case that I can see where a District Court entered a stay of

6     either a trial or of an execution of judgment, which is what

7     I think the alternative request is, after a final judgment

8     of validity was affirmed by the Federal Circuit.

9            So you have got a final judgment of validity,

10    which we certainly have here.  I don't find any case that

11    provides any authority for any stay of a trial or execution

12    of judgment.  I mean that is exactly what they are doing

13    here.

14           THE COURT:  So what is the PTO doing?  If, as

15    a legal matter, this patent is valid, why are they even

16    looking at it?

17           MR. ROPER:  There is no question that against

18    other parties, the patent might well, in a hypothetical

19    case, be invalid.  In this case, of course, the patent has

20    expired so it really is not a significant issue.  But

21    insofar as these parties are concerned and the damages are

22    concerned, we have a final judgment of validity and that

23    is it.

24           And even, Your Honor, in *Standard Havens*, I

25    think this is really important.  In the third full paragraph

1    of the first page of the opinion, in that case which they

2    rely on so heavily, I would like to quote it if I can.

3                That Court said:  "We do not regard the issues

4    of patent validity and judgment as having been incorporated

5    into a final judgment that would moot the issue of a stay

6    pending completion of effectively the reexamination."

7                In fact, they overruled the District Court and

8    reversed the District Court on that.  In other words, it

9    was extremely important in that case that they found no --

10   there was no final judgment of validity.  Consequently, in

11   that case, they could thereby enter the stay only because

12   there was no final judgment of validity.  That's not the

13   case here.

14               In fact, in all the cases that they cite where

15   stays were granted, in fact, they were all before the trial

16   on validity.  There was nothing, no stays were granted after

17   that as far as I'm concerned.

18               And the other thing I would like to point out.

19   Even in the *Flexiteek* case in Florida, which is another

20   District Court case, of course, even there, Your Honor, that

21   issue of the final decision was very important because in

22   there, the stay was granted prior to a determination by the

23   Federal Circuit of any question of validity.  And the stay

24   was granted in a decision which is, actually it is Exhibit 2

25   to their reply brief.  It is an earlier decision.  So there

1    was no final adjudication by the Federal Circuit of validity

2    and the Court consequently considered it could go ahead and

3    determine the stay, whether stay was appropriate.

4              But once the Federal Circuit ruled in the

5    subsequent opinion in *Flexiteek*, they had to rely on Rule

6    30(b)(6) or 30(b) -- I'm sorry -- 60(b) to set aside the

7    judgment.

8              So before final adjudication of validity

9    affirmed by the Federal Circuit, you look at the

10   discretionary factors, many of which you mentioned this

11   afternoon, but after you have a final adjudication of

12   validity, it is affirmed by the Federal Circuit, those cases

13   say that the only relief that you have available to you is

14   to set aside the judgment under Rule 60.  And that, as I

15   say, is true even if you look at the very, very complex

16   facts in the *Flexiteek* case.

17             So I think that is important.  And it really

18   came to me when I read their reply brief.  There is that

19   fundamental distinction.  Final adjudication affirmed by the

20   Federal Circuit, no stay.  You have to go by Rule 60 which

21   they are not even purporting to do here.

22             And if you get into the discretionary factors,

23   Your Honor, I think the briefs pretty well lay out the

24   point.  That I mean it is seven and-a-half years since they

25   filed the reexam.  And the point that they mentioned, I mean

1    they had all those documents during the course of the trial

2    here.  They could have asked it earlier.  It is just far

3    too long.  And those are just part of the discretionary

4    factors.

5              THE COURT:  To the extent I get to those

6    factors, would you agree that you do have an adequate remedy

7    at law?  That we are just talking about money and you are

8    going to be able to collect it with interest?

9              MR. ROPER:  Well, I guess adequate remedy of law

10   is -- let me answer it this way, Your Honor.  I would say

11   no, because I think if somebody has been harmed and money is

12   owed to them, I think the usual course is that they are

13   entitled to get that money and do with it what they will.

14   I think that is the adequate remedy.  And I think that is

15   the remedy Dow should have here.

16             I don't consider it to be an adequate remedy if

17   they got an interest free or a low interest loan, I should

18   say, for the life or a very long time.  Dow is entitled to

19   get that money and do whatever it wants with it.  They owe

20   us the money.

21             As I say, it also comes back to that idea of the

22   final adjudication of validity.  They haven't shown Rule

23   60(b) relief to get out from under that decision.  So I

24   think they owe us the money, and the proper adequate remedy

25   would be to pay us the money.

1          THE COURT:  If I deny the stay and even the

2    alternative relief they are seeking, do you think I have

3    authority to make you post a bond or provide some sort of

4    protection in the event that the PTO ultimately invalidates

5    the patent?

6          MR. ROPER:  No, I don't think so, Your Honor.

7    Because I think this over and done with as far as we are

8    concerned on this.  I don't think that -- even if they

9    invalidate the patent years from now, which they're not, I

10   don't think they're going to do, but even if they would,

11   this one is over.  Just like they can't get the damages.

12   There is no difference between the damages.

13          To put it in the way you asked the question of

14   Mr. Feldstein, there is no difference between the damages

15   they already paid us and this tidying up, if you will, of

16   the damage issue because of the gap in terms of their actual.

17          THE COURT:  I thought that was your position.

18   So even if, let's just say, I know you don't think it will

19   happen, but let's say the patent was invalidated on Monday.

20   Your position would still be to go forward with the trial

21   and enter judgment because it is too late from Nova's

22   perspective for the PTO to do anything to help them.

23          MR. ROPER:  Yes, unless they could make a

24   showing under Rule 30(b).  60(b).  Excuse me.  I keep saying

25   30.  60(b)(5) or (6).  That is their only route or relief.

1    Not a motion to stay.

2              THE COURT:  Thank you.  Is there anything

3    further?

4              MR. FELDSTEIN:  Your Honor, I think as we

5    pointed out and as we heard here, Dow counsel is conflating

6    final judgment on validity with a final judgment on

7    supplemental damages.  There is no judgment on supplemental

8    damages, much less a final judgment.  That is why this is

9    distinct.  That is why *Standard Havens* says to preserve the

10   status quo, you should stay pending reexamination.

11             And Dow's position that once they pay, that Your

12   Honor has no authority -- you clearly have authority for a

13   stay.  And Dow's position that you have no authority to

14   order them to post a bond, should the position be reversed,

15   shows all the more reason why Your Honor should stay the

16   case because otherwise Nova will be irreparably armed.

17             THE COURT:  All right.  Thank you.

18             MR. FELDSTEIN:  Thank you, Your Honor.

19             THE COURT:  Let's proceed with the rest of the

20   pretrial conference on the assumption that I am not going to

21   stay, but we will come back to that before we finish with

22   you today.

23             But I do want to hear brief argument on the

24   motions in limine.  We will first hear argument on Dow 's

25   motions in limine, so we will hear from Dow on those,

1 please.

2     MR. REISBERG:  Good afternoon, Your Honor.  Josh

3 Reese Berg from the law firm Quinn Emanuel.

4     I would just like to touch first on Dow's first

5 motion in limine which seeks an order excluding testimony

6 and opinion from Nova's damages expert, Mr. Chelton Tanger,

7 that Dow is not entitled to any lost profits during the

8 supplemental damages period.

9     The reason we filed this motion in limine is we

10 wanted the Court to understand what would have had to have

11 happened for Mr. Tanger's opinion to even be plausible.

12 For Nova and Mr. Tanger' position to be plausible on

13 January 1st, 2010, at the start of the supplemental damages

14 period, Dow would have had to immediately have stopped

15 shipping its high premium high grade performance Elite

16 products to the customers that the jury determined at the

17 2010 trial, Dow would have captured but for Nova's

18 infringement and that Dow would have been supplying to in

19 the "but for" world.

20     But Nova points to nothing indicating that this

21 would have happened, that all of a sudden Dow would have

22 lost the businesses as of January 1st, 2010 when the jury

23 determined it would have had it on December 31st, 2009,

24 and Nova points to nothing indicating Dow would have failed

25 to maintain the business through the supplemental damages

1    period and through the expiration of patents on October

2    15th, 2011.  So, in that regard, Mr. Tanger's opinion is

3    inconsistent with the jury verdict which reflects a finding

4    that in the "but for" world Dow would have captured about

5    80 percent of Nova's infringing sales.

6            The second reason Mr. Tanger's opinion is

7    entirely inconsistent with the statements made by Nova's own

8    witnesses in declarations submitted in opposition to Dow's

9    motion for a permanent injunction which Judge Farnan

10   previously denied, those witnesses testified that Nova's

11   customers could not have immediately transitioned to an

12   alternative resin if they wanted to switch from Nova's

13   infringing Surpass products.  They would have needed between

14   three and 18 months to do so.

15           Nova used those declarations successfully to

16   essentially establish that these customers would have

17   experienced significant harm if a permanent injunction

18   issued.  So Mr. Tanger should not be permitted to introduce

19   an opinion that Dow is not entitled to any lost profits

20   where Nova's own declarants confirm that Nova's customers,

21   about 80 percent of whom would have been Dow's as of

22   December 31st, 2009 in the "but for" world, could have

23   immediately transitioned to new products.

24           So here, too, Mr. Tanger's opinion is

25   inconsistent with the statements of Nova's witnesses and not

1    substantially tied to the particular facts of this case.

2    That is why Mr. Tanger's so-called no lost profits opinion

3    should be excluded under Rule 702.

4              THE COURT:  You say it is not consistent, and it

5    sounds like there are some holes you might be able to punch

6    in it, but you are putting an awful lot of weight, it seems

7    to me, on the fit requirement.

8              Can I really say that your criticisms are so

9    strong that his theory just doesn't even satisfy the fit

10   standard and therefore it should be excluded entirely?

11             MR. REISBERG:  Again, it goes to this idea of

12   what needs to have happened in the "but for" world, so

13   Mr. Tanger's zero lost profits opinion is simply implausible

14   with respect to what the jury previously decided.

15             THE COURT:  Are you arguing the other two as

16   well?

17             MR. REISBERG:  I'm arguing the second motion in

18   limine.  The third has been rendered moot in light of the

19   stipulation filed by the parties earlier today.

20             THE COURT:  Okay.  Well, that's fine.  Don't

21   argue that one.

22             (Laughter.)

23             MR. REISBERG:  I won't.

24             THE COURT:  You can argue the second one, though.

25             MR. REISBERG:  The second motion is being made

1    so that the parties are not relitigating issues with respect

2    to the presence or absence of acceptable noninfringing

3    alternatives that were either raised or could have been

4    raised at the prior trial.  So Nova's pretrial statement

5    as well as its opposition of Dow's motion make pretty

6    clear Nova's intent to use the upcoming trial as a means

7    to basically rehash issues relating to the availability of

8    acceptable noninfringing alternatives that have already been

9    decided by the Court, that Nova has already litigated or

10   could have litigated.  So Nova's --

11           THE COURT:  But nobody, just to be clear, nobody

12   has litigated or even considered whether there were

13   acceptable noninfringing alternatives beginning January 1st,

14   2010.  Correct?

15           MR. REISBERG:  That's correct.  But at the prior

16   trial, the proposed alternatives that Nova raised included

17   certain polyethylene resins, including Exxon's Exceed product

18   and Chevron Phillips Impact product.  And for purposes of the

19   2010-2011 time period, Nova is seeking to relitigate whether

20   those products are acceptable noninfringing alternatives even

21   though Judge Farnan and the jury decided previously that there

22   were no acceptable noninfringing alternatives on the market.

23   Nova is pointing to other products but these products were all

24   available prior to 2010 that Nova could have raised at the

25   prior trial if it wanted to.

1          Nova's contention as to why it should be

2    permitted to relitigate these issues is based on what Nova

3    characterizes as so-called increased competition for these

4    products during the 2010-2011 time period due to certain

5    industry-wide market dynamics.  But the issue for purposes

6    of lost profits analysis is not whether products merely

7    compete with the patented product, as the Federal Circuit

8    has held, but whether these products possess the advantages

9    of the patented invention such that they would have been

10   acceptable substitutes to the customers who purchased the

11   infringing products because of those patented properties.

12   And Nova points to nothing indicating that any increased

13   competition or any market dynamics that may have existed in

14   2010 or 2011 would have rendered these particular products

15   acceptable as substitutes to the customers who purchased the

16   infringing Surpass products because of the patented product.

17          THE COURT:  I just want to be clear.  Is it your

18   understanding that Nova wants to point to products that were

19   put before the jury and Judge Farnan and at least implicitly

20   found not to be acceptable noninfringing alternatives?

21          MR. REISBERG:  Nova wants to argue that certain

22   products that it previously raised at the first trial that

23   the Court determined implicitly or not were noninfringing

24   alternatives, they want to re-raise that issue here but they

25   want to point to additional products.

 1                    THE COURT:  Do they want to point to some of the

 2      same products and additional products?

 3                    MR. REISBERG:  Yes.

 4                    THE COURT:  With respect to the additional

 5      products, your point is those products were actually all on

 6      the market prior to 2010 as well?

 7                    MR. REISBERG:  That's correct.  And Nova doesn't

 8      dispute this.

 9                    THE COURT:  And they could have put those in

10      front of the jury but they didn't?

11                    MR. REISBERG:  That's correct.

12                    THE COURT:  Is there anything else?

13                    MR. REISBERG:  That is it.

14                    THE COURT:  Okay.  Thank you.

15                    MR. REISBERG:  Yep.

16                    THE COURT:  We will hear from Nova and first

17      hopefully confirm that the third motion of Dow is moot.

18                    MR. FELDSTEIN:  Yes, Your Honor.  The parties

19      filed a stipulation maybe two hours ago while you were in

20      your other hearing that rendered Dow's third motion moot and

21      Nova's first motion moot, assuming Your Honor signs the

22      stipulation.

23                    THE COURT:  I assume that I will.

24                    MR. FELDSTEIN:  So let me respond, Your Honor.

25      Unless you have a preference, I'll do them in the order they

1   were presented.  Dow's motion in limine 1.

2             First, Dow is seeking to exclude Mr. Tanger's

3   testimony that -- well, let me clarify what Mr. Tanger's

4   testimony is.  Mr. Tanger's testimony is that the opinion

5   of Dow's expert, Mr. Hoffman regarding lost profits is

6   speculative and unsupported as lost profits because, for

7   example, Dow didn't have any excess capacity for nearly the

8   entire supplemental damages period and that the market

9   dynamics were not static during the supplemental damages

10   time period.  So because it's Dow's burden to prove lost

11   profits, in our view, it should be a nonstarter to suggest

12   we can't challenge their proofs on lost profit.

13             Mr. Tanger, in fact, has an alternative opinion.

14   Mr. Tanger's opinion is that because Dow does not prove lost

15   profits with a reasonable degree of certainty that Dow is

16   only entitled to a reasonable royalty which he sets forth.

17             Mr. Tanger's alternative provides a calculation

18   in the alternative where if you look at the months, the three

19   months at the end of the supplemental damages time period

20   where Dow did actually have excess capacity that it could

21   have used to make Nova's sales, Mr. Tanger does calculate

22   what Dow's lost profits would be for that time period.

23   So the premise of the motion that Mr. Tanger is going to

24   testify that Dow is not entitled to any lost profits is not

25   what he is going to testify to.  He is going to testify

1    that Mr. Hoffman, his arguments are speculative and are

2    missing points, and Mr. Tanger is going to testify that you

3    can calculate lost profits based on when Dow actually had

4    capacity.  So the premise of Dow's motion is misplaced.

5              I think that really important point, Your Honor,

6    that you heard from the beginning of the argument on the

7    motion in limine by Dow's counsel is their view that as soon

8    as the jury decided that Dow is entitled to lost profits in

9    the original jury case, Dow, since that time, has to be

10   assumed to be standing in Nova's shoes.  So what they're

11   saying -- I don't know if this came across clearly, but

12   they're saying because the jury found that Dow is entitled

13   to lost profit on some percent of Nova's sales up through

14   the end of 2009 that what one has to assume on January 1st,

15   2010, Dow was making the further sales, not Nova.

16             If you make that assumption which we look at sort

17   of a double "but for," you know, we're now looking at a "but

18   for" world, what if Nova wasn't selling in the supplemental

19   damages period and they want to put back a "but for," what

20   if Nova was never selling ever.  And this double "but for,"

21   I think we're going to hear a lot of it at trial.  It becomes

22   Mr. Hoffman, their damages expert, one of his back-up

23   positions whenever pressed that Dow had already been making

24   those sales.

25             There is no law that they cite or that we're

1    aware of that allows you to put the plaintiff back into the

2    defendant's shoes and assume that they were already making

3    their sales.  That is the premise of their argument.  Of

4    course, that is not true that that happened.  Of course, we

5    wouldn't be if Dow was making all those sales, and, of

6    course, it's not true that they even had an injunction.

7    They were denied the injunction so that Nova could continue

8    to sell.  So the idea you heard, that they told you that

9    Mr. Tanger's testimony is inconsistent, it doesn't fit, not

10   the facts of their case but their assumption that they are

11   in Nova's shoes going forward.

12              And I think that the problem again is not that

13   we don't fit the facts.  The facts are that Dow has to prove

14   lost profits.  Dow had capacity constraints.  The market

15   changed.  Those are the facts.  The fit they don't like, and

16   I think what they're complaining about is it doesn't fit

17   within their theory of the case that they should be presumed

18   to be in Nova's shoes, which I think is a false premise from

19   the start.

20              THE COURT:  Is there going to be evidence,

21   which could include or consist of an opinion, that something

22   significant about the market did change in and around

23   January 2010?

24              MR. FELDSTEIN:  There will be testimony, two

25   aspects, yes.  The first and most major aspect with respect

1    to lost profits is that before 2010, Dow always had excess

2    capacity of their plants.  They always did.  There was

3    always free space.  They were never running at full capacity.

4              For the entirety of the 2010 and for most of

5    2011, the market was -- there was a lot of demand in the

6    market and all of the suppliers were producing more.  And

7    during that time, 2010, Dow was running at maximum capacity

8    for the entire year.  And when you are running at maximum

9    capacity, if you have no capacity, you have no lost profits.

10             Then for 2011, for all but the last three months

11   of the period, they were also running at maximum capacity.

12   So that is a major change.

13             There are other major changes in the market,

14   too, that are not as binary but evolutionary.  That over

15   time, there is changing in how the customers used the

16   products and what their demands are and the principal

17   issue that was before the jury and that Dow represents and

18   relies on of why, in their view, their Elite product is a

19   substitution for Nova's Surpass product is processability.

20             But we can point you to Dow documents and Dow

21   testimony.  And I'm looking at Exhibit A8 to our motions in

22   limine where the customers no longer believed -- that some

23   customers at least no longer believed that processability

24   is as important.  What happened was customers found ways to

25   work around processability and use less expensive and more

1    products to compete.  So that was not a binary change as

2    Dow's lack of capacity but more an evolutionary change.

3            And Dow, with respect to both their Motions

4    in Limine 1 and 2, what they view is that the market was

5    completely stagnant after December 31st, 2009, and not

6    only does that not support the facts, I don't think it is

7    a credible view that in a billion dollar market nothing

8    changed any more due to competition.

9            THE COURT:  What about the evidence that the

10   customers were sort of fixed or sticky and couldn't quickly

11   adjust who their suppliers were going to be?  Isn't that a

12   factor that suggests over the time frame here of about

13   20 months or so not much could have changed?

14           MR. FELDSTEIN:  Well, first of all, I disagree

15   with the way Dow spins that.  Dow spins that to say Dow was

16   selling instead of Nova so nothing could have changed.

17           With respect to the evolution, the evolution

18   didn't start on December 31st, 2009, January 1st, 2010.  And

19   so the fact that people were already transitioning to what

20   may have been acceptable or not, that was already changing.

21   It was what we have seen.  And there is reference to it with

22   respect to use of multilayer films which allows you to mix

23   and match different components together, that there was an

24   exponential rise in the use of multilayer films.  So I don't

25   think that the stagnancy of the market helps them at all,

1    and it certainly doesn't help them at all with respect to

2    their lack of capacity in 2010 and most of 2009.

3             THE COURT:  Well, sticking on lost profits, what

4    about Judge Farnan and his analysis in denying the permanent

5    injunction seemed to at least think that lost profits were

6    going to be awarded after for the supplemental damages

7    period.  Is that a misinterpretation of what his thinking

8    appears to have been?

9             MR. FELDSTEIN:  I think if Dow had lost profits

10   and was able to show it, they would be entitled to recover it.

11   I think that the opinion from Judge Farnan says nothing more.

12   But when you have no capacity, you have no lost profits

13   because you couldn't have made the sale.  So we're not arguing

14   that they were entitled to it and somehow became unentitled to

15   it because they were at capacity.  We're arguing they didn't

16   have a lost profit when they had no capacity.  If you can't

17   make the sale, you didn't have lost profits.  You didn't

18   miss the sale because you could not have made the product

19   yourself.

20            THE COURT:  Okay.  And I know what you said is

21   partly going to a noninfringing alternatives as well, but

22   you probably have things you specifically want to say about

23   that.

24            MR. FELDSTEIN:  I do, Your Honor.  As to

25   Motion in Limine No. 2 from Dow, our point is and what the

1    testimony is and what the factual issue is, is there was

2    evolution in not what was available but what was acceptable.

3    And as Your Honor pointed out, there was no judgment, no

4    decision, no testimony even in the jury trial as to what

5    was acceptable to the customer, the end user in 2010 and

6    2011.  And as I pointed out, processability, which is the

7    key factor that Dow relied on to say that the competition is

8    primarily Surpass and Elite, that processability factor,

9    according to Dow's own documents, became less important.

10   They had customers that just didn't care about processability

11   anymore.

12          So, in sum, just as you said, there is no

13   estoppel whatsoever, because the issue of what is acceptable

14   in 2010-2011 wasn't before the jury, and the only way you

15   can infer anything is that if you assume the market and the

16   customers were entirely stagnant, which I don't think, as I

17   said, is consistent with the facts, nor a reasonable premise.

18          THE COURT:  Okay.  Thank you very much.

19          MR. FELDSTEIN:  Thank you.

20          THE COURT:  Is there any rebuttal?

21          MR. REISBERG:  Thank you, Your Honor.  Simply

22   to touch on three points that Nova's counsel raised relating

23   to the jury's prior findings, this issue of manufacturing

24   capacity and this issue of processability.

25          So with respect to the jury's prior findings,

1    it is not Dow's position that Nova cannot challenge Mr.

2    Hoffman's lost profits analysis.  It is simply that Mr.

3    Tanger cannot ignore the prior rulings of the jury or the

4    prior determinations made by the jury and the prior rulings

5    by this Court.

6            Implicit in the jury's lost profits award is a

7    finding that in the "but for" world, Dow would have been

8    making about 80 percent of Nova's infringing sales of

9    Surpass, and that needs to factor in into Mr. Hoffman's

10   analysis.  And because he is basically stating an opinion

11   where at no point in the supplemental damages period Dow

12   would have been able to obtain any lost profits, that

13   opinion, in and of itself, is implausible in light of what

14   the jury implicitly determined, which was upheld by Judge

15   Farnan.

16           THE COURT:  Evidently, he is of the view you are

17   entitled to some lost profits, at least for three months.

18   That doesn't change your position, though, I take it?

19           MR. REISBERG:  No.  What that goes to is

20   actually manufacturing capacity.  And what you heard from

21   Nova's counsel is that Dow somehow lacked manufacturing

22   capacity during that period.  That is simply not true.

23           As you will hear likely from Dow's global

24   business director for solution and gas based polyethylene,

25   Dow actually had substantial manufacturing capacity during

1    that particular time period.  And Nova's focus on the actual

2    production capacity in 2010 and 2011, it seems misplaced in

3    light of the case law.  All the patentee needs to show in

4    order to prove entitlement to lost profits damages is that

5    it had potential capability to manufacture the additional

6    products.

7              As the Court held in *New England Medical Center*

8    *v Peprotech*, a District of New Jersey decision from 1994,

9    the Court held that the patentee need only prove that "it is

10   more likely than not that it had the potential capability to

11   manufacture the additional products sold by the infringer.

12   The patent owner is not required to show that it had empty

13   factories waiting for additional work."

14             Now, Nova's counsel suggested that Dow simply

15   couldn't manufacture any products in 2010 and 2011.  That is

16   just simply incorrect and that evidence will come out at the

17   upcoming trial.

18             Nova also focuses on this idea of processability

19   as a factor that has significantly changed in the market,

20   but Nova has pointed to no customer where the importance of

21   processability has changed from any point during the initial

22   infringement period to the supplemental damages issue.

23             In fact, this issue was addressed at trial by

24   Mr. Christopher Thompson, Mr. Kipp Thompson actually, who

25   testified that some of Dow's customers consider process-

```
1     ability to be important, some don't.  And that Dow sells

2     its high margin Elite products to those customers who do

3     value processability, and that as you will likely hear from

4     Mr. Kipp Thompson again hasn't changed in the supplemental

5     damages period.  So Nova's reliance on one particular

6     document to show that one customer may not have cared about

7     processability, it doesn't show that the importance of that

8     processability was any different during the prior period as

9     it is today.  And that goes to both Dow's first motion in

10    limine as well as the second.  They just sort of overlap.

11              THE COURT:  Okay.

12              MR. REISBERG:  Thank you.

13              THE COURT:  Thank you very much.  Let's hear

14    brief argument on Nova's motions in limine which I

15    understand now are just 2, 3 and 4.

16              MR. FELDSTEIN:  Correct Your Honor.  So Nova's

17    Motion in Limine 2 relates to speculation from Dow's fact

18    witnesses and documents generated by Dow's fact witnesses at

19    the request of counsel.  What we're seeking to preclude is

20    to have Dow's fact witnesses come up and speculate as to

21    what they would have done given the availability of making

22    Nova's sales.

23              We have no problem with them testifying here is

24    what we did in that time period, here is what we have done

25    historically, but we have a problem with them coming up and
```

1     testifying, as we expect they will, that we would have

2     modified our production capacity as such in order to make

3     Nova's sales.  And the reason or one of the reasons we have

4     a problem with that, other than it being speculative, is

5     that Dow has, but did not -- Dow has procedures whereby they

6     figure out what we're going to produce at which plant, how

7     we're going to move our production around, what the costs

8     and benefits of doing that are, and these are sophisticated

9     tools.  You have seen reverence to logility in the briefs.

10    These are sophisticated tools that Dow uses to actually plan

11    here is how we're going to implement an opportunity to make

12    X polymer.  To remove something, we'll do something.  We'll

13    consider the freight costs and where the customer is, which

14    can be significant.

15          Dow's witnesses are going to come up and testify

16    we believe irregardless and independent of Dow's actual

17    procedures for how they allocate capacity.  We asked Dow's

18    witnesses what do you do to figure out how to allocate

19    production, make your decisions?  And they said they rely

20    on those tools plus further group decisions.  These tools

21    are something we have never soon, they never produced.

22          So instead of relying on what their actual tools

23    are, you are going to have speculation about what we could

24    have done.  And that, in essence, it's like a best evidence

25    violation where rather than testifying about putting the

1  contract before the Court and being able to point to the

2  provision, you have a witness who is going to come and

3  testify, well, my recollection of the contract is so-and-so

4  and that is excluded for a reason.  It is excluded because

5  if you want to see what the contract said or if you want to

6  see what the procedures are for allocating capacity, you

7  should look at the procedures and not speculated testimony

8  on top of that.

9            THE COURT:  Now, you didn't give those materials

10  in discovery but you also didn't evidently complain about that.

11            MR. FELDSTEIN:  Well, we did complain in

12  correspondence that we weren't getting discovery from them

13  related to their policies and procedures.  We complained and

14  told them when they refused to provide a woman, Ms. Budd,

15  who has written publically and been quoted publicly about

16  what Dow's policies and procedures are at a corporate level.

17  We told them that if you are going to withhold --

18            THE COURT:  But you have never raised it with

19  me, as I recall.

20            MR. FELDSTEIN:  That's true, Your Honor.  But

21  we're not here -- it's not like the cases that Dow cites

22  where we're complaining we want to seek additional discovery.

23  We don't need this additional information for our case.

24            THE COURT:  As I understand it, they don't think

25  they need it in their case.  They're not planning to present

1    it.

2                MR. FELDSTEIN:  I know.  They don't want to rely

3    on that.  What we're concerned about is they don't want to

4    rely on the facts, they want to rely on speculation.

5                THE COURT:  Well, some degree of speculation is

6    inherent; right?  We don't live in the "but for" world.

7                MR. FELDSTEIN:  For the fact witnesses, it

8    shouldn't be, Your Honor.  For the fact witnesses, they

9    should be up here testifying about what we did.  Here are

10   our policies.  But they shouldn't be talking about policies

11   and practices that they have kept back.

12               THE COURT:  All right.  Move on to the next one.

13               MR. FELDSTEIN:  Can I touch briefly on the

14   documents?  There is a document section.  There is a whole

15   series of documents that are attached to our motion where

16   they were clearly manufactured and the witnesses admitted

17   they were made not as business records but they were made

18   at the direction of counsel and that Dow wants to rely on

19   these.

20               We were asking the witnesses questions about

21   them.  They admitted they were not business records.  They

22   admitted that they were prepared at the direction of

23   counsel.  And when we asked what specifically were you asked

24   to do, there were privilege objections that prevented us

25   from inquiring.

1           If the documents had been prepared by an expert

2     witness, there would have been no privilege objections.  We

3     would have seen all the foundation to the documents themselves

4     and not the selections that were directed by counsel.  And it

5     would have been transparent rather than privilege objections

6     as to why the documents were generated, what assumptions

7     were made, why certain products were selected and why others

8     were rejected, all of which goes to what Dow's margin is

9     going to be in their historic margin.

10          If you want to pull out a subset of their most

11    profitable products and put that in your spreadsheets, Dow's

12    margin will be higher than if you do a full complete

13    forthright dump of all the data.  And what we don't know,

14    because we were prevented from asking, is why the selections

15    were made.  These were privilege objections and it is not

16    proper for Dow to rely on privileges of both the sword and

17    shield, to be able to introduce documents that it is not

18    going to allow testimony on.

19          So I'll move on, Your Honor, to Nova's Motion in

20    Limine No. 3 which relates to our Daubert motion regarding

21    Mr. Hoffman, their damages expert.  And what it relates to

22    me are the same issues we already discussed.

23          The first part of it is that Mr. Hoffman has a

24    theory that because Dow was running at maximum capacity,

25    they could have made capacity by moving one product to

1   another location, moving that to a third location, and then

2   foregoing production of a product from a third location.

3              This also implicates what Dow actually did,

4   Dow's actual tools to allocate production.  And the short

5   problem is that you are going to have Mr. Hoffman testify

6   Dow could have done this, and it becomes an untestable

7   hypothesis, an untestable opinion because, yes, maybe or

8   maybe not Dow could have done it, but what would the costs

9   have been?  And those are factors that are completely

10  missing from Mr. Hoffman's analysis because he, too, didn't

11  get apparently these tools like logility that Dow uses to

12  figure out what are we going to actually make our production

13  on.

14             Similarly, Mr. Hoffman has testimony that the

15  market was stagnant after December 31st, 2009.

16             In addition to not being, as I said before, not

17  a particularly reasonable position that a billion dollar

18  market is going to be completely stagnant for nearly two

19  years, his foundation, his principal foundation is a half an

20  hour phone call with two interested Dow employees who told

21  him not much has changed.  They told him just the negative,

22  not much has changed.

23             There is a lack of independent analysis of

24  the market.  There is a lack of independent analysis from

25  other than interested witnesses and a few Nova documents.

1    So essentially you have Mr. Hoffman improperly relying on

2    one-sided hearsay from Dow's witnesses and calling that

3    his opinion, and we don't think that meets the standards

4    in Daubert.

5              I'll move on, Your Honor, to the last motion in

6    limine, Motion in Limine No. 4.  It relates to another

7    opinion of Mr. Hoffman related to inventory.  And Your Honor

8    may recall that Mr. Hoffman had a first updated expert

9    report that we had an issue with.  And in that updated

10   report, he added a new opinion based on inventory.

11             However, the foundation for his inventory

12   opinion was Exhibit MM to our motion in limines.  It was one

13   page that listed by month how many pounds of material Dow

14   had in its solution polyethylene inventory.  It had no break

15   down of what the products are or where they were located, if

16   they already had people's names on them, what the levels

17   that Dow required its minimum inventory to be.  And these

18   were all defects that Mr. Hoffman recognized and tried to

19   get information from Dow about but didn't.

20             What Dow is going to do we expect at trial,

21   whenever we point out either through our direct testimony

22   or cross Mr. Hoffman that during month X, you didn't have

23   enough octane, you didn't have enough capacity, you didn't

24   have something else, you couldn't have made more material,

25   he will say, ah, we could have relayed on inventory.  But

1    his inventory opinion, his foundation of it is one document.

2    And what his opinion in his report is, and I quote:  "It is

3    likely it is on its face speculation beyond I think what is

4    relevant speculation for the purposes of damages."  That it

5    is likely that Dow would have relied on inventory.

6             He doesn't have the foundation to be able to say

7    what was in Dow's inventory or that it was available or that

8    it would have been useful in any given time period.  And

9    what we are particularly concerned about is that Your Honor,

10   when Your Honor extended trial, Your Honor limited any

11   supplementation by Dow's experts.  This is D.I. 718.  Shall

12   be based only on facts learned through discovery of Nova.

13            What we anticipate that they're going to do,

14   if Mr. Hoffman is allowed to rely on his "it is likely"

15   testimony regarding inventory is that they're going to have

16   Dow fact witnesses present more information about Dow's

17   inventory that was not available to Mr. Hoffman at the time

18   of his first two reports and then Mr. Hoffman's is going to

19   effectively adopt that as a foundation for what is a

20   deficient opinion and that is either expressly or in effect

21   skirting what your order D.I. 718 limits Mr. Hoffman to

22   supplementing based solely on discovery from Nova.

23            So the foundation for his testimony is only the

24   monthly volumes that Dow had, and to take that and be able

25   to opine, whenever pressed, that Dow simply could have

1   relied on inventory to overcome any problem it had is --

2   it doesn't have a reasonable basis.  It doesn't have a

3   reasonable foundation.

4          THE COURT:  So part of a concern is that fact

5   witnesses testifying in advance of Mr. Hoffman will sneak in

6   testimony about what the inventory was?

7          MR. FELDSTEIN:  It is.  I think that they

8   actually have disclosed their intent to do that.  For

9   example, you heard a reference to Mr. Thompson earlier about

10   Mr. Thompson is going to discuss what Dow could have done

11   with its products.  And Mr. Thompson is not testimony that

12   Mr. Hoffman relied on for his first two expert reports.  He

13   may have talked to hmm subsequently but that would be in

14   conflict with your order D.I. 7178.  They put Mr. Hoffman in

15   their proposed -- in the issues they're going to try, they

16   put Mr. Hoffman, his opinion following fact testimony from

17   witnesses and information that Mr. Hoffman didn't rely on.

18          THE COURT:  Okay.  Let me hear from Dow, please.

19          MR. NIMROD:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. NIMROD:  Your Honor, I'll be addressing

22   Nova's Motion Nos. 2 and 3.  Mr. Margolis will take care of

23   motion No. 4.

24          Nova's Motion No. 2 is all about discovery

25   issues for which there was no motion to compel and inmost

1    instances no meet and confer either.

2              I'd like to start with the issue of Cathy Budd.

3    They asked for her deposition.  And we told them that

4    Ms. Budd had nothing to do with solution polyethylene

5    planning.  We also sent them a note and we told them that

6    we would allow them to take a deposition again, a second

7    deposition, of a person who was involved in that, Mr. Jose

8    Obregon who will be testifying at the trial.

9              We wrote a letter to them, an e-mail.  We say

10   based on the scope of discovery, Dow has already provided

11   and has agreed to provide with respect to issues relating

12   to Dow's inventory and supply chain.  Nova's continued

13   demand provide Ms. Budd or, quote, an alternate global

14   supply director in place of Ms. Budd as well as Mr. Bunker

15   and Mr. Wetekamp is unreasonable.  However, as noted, to the

16   extent Nova believes it is entitled do additional discovery.

17   -- I think this is important -- following the additional

18   discovery from Mr. Wright -- another deposition -- Mr. Obregon

19   -- the one I mentioned -- and Mr. Wetekamp, Dow will consider

20   Nova's request in good faith.

21             He knows about solution polyethylene planning

22   and said they took his deposition a second time, and they

23   never complained about it at all after that.

24             THE COURT:  Let's assume that all of that is

25   right and that they perhaps should have done something

1    differently during discovery.  Tell me about at this trial,

2    are they right that there is going to be speculation from

3    your fact witnesses as to what you would have done in the

4    "but for" world?

5                   MR. NIMROD:  Your Honor, I put two ways.

6    First, the witnesses will be talking about what our

7    capabilities were, the capabilities of Dow, something they

8    do on a regular basis.

9                   THE COURT:  Are they going to rely on these

10   sophisticated computer model rules in order to give that

11   testimony?

12                  MR. NIMROD:  No, they are not.  Let me, just for

13   a moment.  We're not relying on those tools.  And, once

14   again, there was no meet and confer on that at all.  They

15   asked for a deposition, we gave them a lot of discovery, and

16   there was no meet and confer at all on these tools.

17                  THE COURT:  So I won't hear anything about the

18   tools?

19                  MR. NIMROD:  Not from us, Your Honor.

20                  THE COURT:  Why is that not the best evidence?

21   Why isn't that a problem for you?

22                  MR. NIMROD:  Actually, it gets exactly to a

23   point that Nova's counsel made.  What the tools are used

24   for is he said is where there is an opportunity.  Then you

25   consider the customer location and say where is the customer

1    located?

2              The damages theory here and in the first trial

3    has nothing to do with customer specific location.  In

4    other words, there was no analysis here are Nova's 50

5    customers and one is located in Pennsylvania and one is over

6    in California and let's figure out what the freight cost of

7    each is.

8              Mr. Hoffman at the first trial simply testified

9    that they would allocate production up in Fort Saskatchewan.

10   You may have read about it in the papers.  There is a

11   facility up in Canada and one down by the Gulf Coast.  And

12   he said there would have been an 80 percent capture rate.

13   It doesn't identify which specific customers would have

14   bought on which specific dates.  Then he took into account

15   average freight cost.

16             That is exactly how he is approaching it in the

17   first trial and he is approaching it in the second trial.

18   He is not using this tool that might be now we have an

19   opportunity, as he said an opportunity, and we can sell to

20   XYZ company in Wichita, Kansas.  Which facility do we use?

21   Shall we use Fort Saskatchewan or should we use the Gulf

22   Coast?  And he can plug in the model and say, well, it is

23   better to go with the Gulf Coast here because the freight

24   might be a little different, but that is not how the damages

25   theory goes in the first case or in this case.  So we're not

1    relying on that.

2              THE COURT:  So that won't be part of Mr.

3    Hoffman's opinion and, further, I wouldn't hear any testimony

4    from your fact witnesses about that level of detail?

5              MR. NIMROD:  No, that is all about average cost,

6    Your Honor.  And Mr. Hoffman takes into account those kind

7    of average costs in his analysis.

8              THE COURT:  All right.  Why don't you move on to

9    No. 3.

10             MR. NIMROD:  Okay.  No. 3, Your Honor, this is a

11   motion where they're attacking Mr. Hoffman's methodology

12   not just from this trial, the one that is coming up but from

13   the first trial.  So there are two areas.

14             One is, our position, Your Honor, is all this

15   goes to the weight and is the subject for cross-examination,

16   not admissibility.

17             On this market analysis, they say that

18   Mr. Hoffman talked to the Dow marketing person.  He has

19   looked at documents, obviously.  You can see that in his

20   reports.  He looked at many documents and he gave an

21   opinion.  He had to give an independent analysis for this

22   trial.  Independent analysis.

23             Well, his opinion is that the market didn't

24   change or he is relying on that.  That is an issue.  Did the

25   market change and does the 80 percent capture rate from the

1    first trial apply or not?

2           Mr. Hoffman did the same type of analysis at the

3    first trial that he is doing here.  He look at documents.

4    He talked to Dow's internal marketing person, like Mr.

5    Christopher Thompson, who testified at the first trial and

6    will be testifying again at this trial.

7           He looked at the documents and he gave an

8    opinion that there is an 80 percent capture rate at the

9    first trial.  And in response to Nova's argument that

10   Mr. Hoffman's lost profits calculations were speculative,

11   the 80 percent capture rate, the Court ruled, in Docket

12   Entry 609:  "In the Court's view, however, Dow presented

13   sufficient evidence of the amount of profit it would have

14   made absent Nova's infringement.  Dow's expert on the

15   polyethylene market, Mr. Hoffman, testified that Dow would

16   have obtained 80 percent of Nova Surpass product sales in

17   the absence of Surpass products being on the market.  The

18   jury was entitled to credit Mr. Hoffman's testimony and the

19   Court finds Mr. Hoffman's testimony and the related evidence

20   on lost profits to be sufficient to support the jury's lost

21   profits award."

22          And his analysis now is the same type of

23   analysis.  He is going through, he talked to Mr. Thompson

24   and marketing personnel and concluded that the 80 percent

25   capture rate still applies.  So there is no basis for saying

1    he can't come in now and present the same type of analysis

2    that he did the first time around.

3              In fact, on an independent analysis thought,

4    Your Honor, Mr. Tanger, Nova's expert takes the same

5    approach.  He talked to the Nova marketing people and they

6    told him, well, the market has changed.  Now, we disagree

7    with that but that is the subject of cross-examination.

8    That is not the subject of exclusion.

9              Another issue, Your Honor, they say that

10   Mr. Hoffman is improperly relying on allocation of

11   production.  Well, that was an issue at the first trial as

12   well -- excuse me -- in the first phase of the case.  In the

13   expert reports, Mr. Hoffman relied on the Dow personnel to

14   say where would you have made this if there had been excess,

15   more sales but for the infringement?  And the other side

16   said well, you didn't allocate it right.  But he is doing

17   the same thing again here.  He is relying on the Dow

18   personnel who are in fact the experts in the area on how to

19   allocate their production.

20             And then one final issue, Your Honor.  And this

21   is a key one.  This is the issue of capacity.  This is as

22   simple as Nova saying, well, you didn't have capacity in

23   2010.  In fact, Dow had hundreds of millions of pounds of

24   relief capacity.  The issue here, and it's a key issue, a

25   factual dispute for this trial is the issue of whether Dow,

1    not in terms of like I'm going to shift now in the middle of

2    the year, as part of its production planning each year, but

3    for the infringement, would it have choose to make sales of

4    high margin Elite, Elite has a higher profit margin, and not

5    made, not planned to make more sales of the low margin, high

6    density polyethylene.

7              What you are going to hear is that Nova and Dow

8    both have solution polyethylene plans that are capable of

9    making a wide variety of products, and you can decide at the

10   beginning of the year how much am I going to make of each.

11   And what you do is say I'm going to make as much I can of

12   the highest margin product, and then try to fill out my

13   plant capacity with things that have lower profit margins.

14             Mr. Hoffman is relying on that as part of his

15   analysis for what Dow would have done but for the infringement,

16   and he is not just relying on the Dow personnel for that.

17   You are going to hear testimony and see documents from both

18   sides.  It's just common sense here, Your Honor.  If you are

19   running a business with a solution polyethylene plant and

20   someone says you can see 100 million more pounds of Elite

21   at $0.30 a pound, you wouldn't say, well, no, instead I'll

22   sell 100 million pounds of something at $0.10 a pound of

23   profit.  You simply wouldn't do that.

24             Well, we have documents from both sides that

25   Mr. Hoffman relies on that shows this is exactly how both

1    sides runs their plants, and he relies on that and testimony

2    both from Dow witnesses and Nova witnesses that that is

3    exactly how they run their plants, but that is a factual

4    issue.  That is not the subject of exclusion.

5              THE COURT:  All right.  To the extent I'm

6    concerned Motion in Limine No. 4, that is not you?

7              MR. NIMROD:  No, that is Mr. Margolis.

8              THE COURT:  All right.  Well, let me hear from

9    him.  Thanks.

10             Why don't you pick up on what Mr. Hoffman is

11   relying on.  Is he going to be relying on things he hears

12   from fact witnesses?

13             MR. MARGOLIS:  He is not going to be relying on

14   things that he hears here in trial of fact witnesses.  And I

15   think that what Mr. Feldstein said today about Motion 4 I

16   think is slightly different than what they raised in their

17   motion in limine.  The issue that Nova was concerned about,

18   at least as I'd understood it back in November and December,

19   that Mr. Hoffman in his November 2011 report had an opinion

20   in which he was basing the lost profits that would be due to

21   Dow on the idea that Dow could simply supply Nova's

22   customers out of Dow's finished goods inventory.

23             That opinion, which Nova still spent about the

24   first half of their motion in limine on, has been withdrawn.

25   And I don't think there is any dispute that that opinion has

1    been withdrawn.

2          What I think is really what -- at least what I

3    understood Mr. Feldstein to be getting to is this idea that

4    Mr. Obregon, when they deposed Mr. Obregon in February of

5    2013, which was a deposition Nova requested because they

6    wanted additional discovery on finished goods inventory,

7    they asked Mr. Obregon a significant number of questions,

8    many of which are attached to Nova's motions in limine as

9    Exhibit B, in which Mr. Obregon actually discusses how Dow

10   sets their inventory levels and explains that when they have

11   inaccurate demand forecasts where they have requests from

12   world more than they expected, they can tap into their

13   inventory levels to overcome sort of short term supply and

14   demand levels.  Nova can do exactly the same thing and we

15   attached a document from our brief.

16          THE COURT:  Does Mr. Hoffman want to opine in

17   our case on Mr. Obregon's February testimony?

18          MR. MARGOLIS:  No, all Mr. Hoffman is going to

19   do is acknowledge the fact that Dow does in fact -- the

20   fact that Dow does in fact maintain inventory levels.  Those

21   inventory levels were in his November report.  And that

22   consistent with the testimony and Nova's documents, that

23   those inventory levels can be used to deal with short term

24   supply and demand issues that arise in the market.  He is

25   not going to be using, he is not going to be relying on that

1    to make any conclusions about what the lost profits due to

2    Dow are.  That is what we always understood Nova's complaint

3    to be.

4                    THE COURT:  So he is going to comply with the

5    Court's order and not alter his opinions based on anything

6    other than facts that we learned from Dow; correct?

7                    MR. MARGOLIS:  No, sir.

8                    THE COURT:  So even if Mr. Obregon or some other

9    fact witness comes in and starts testifying to facts about

10   Dow's inventory, you are not going to elicit opinions from

11   Mr. Hoffman that would based on that testimony?

12                    MR. MARGOLIS:  No, there would be no additional

13   opinions that would be based on that testimony.

14                    THE COURT:  Okay.  Is there anything else?

15                    MR. MARGOLIS:  That's it.

16                    THE COURT:  All right.  Let me hear briefly from

17   Nova.

18                    MR. FELDSTEIN:  If I can start, Your Honor, on

19   No. 4 just where we left off.

20                    THE COURT:  Sure.

21                    MR. FELDSTEIN:  Unless Mr. Hoffman is going to

22   rely on other information beyond what is in his report, he

23   doesn't have a foundation to say that inventory can be

24   relied on -- that Dow inventory can be relied on for short

25   term supply issues.  He just doesn't have a foundation for

1    it.  That is an independent problem.  That is why it's not

2    Daubert, it doesn't meet the standard of Daubert.

3              He doesn't have a foundation to speculate Dow

4    could have relied on inventory when he doesn't know what the

5    inventory was, where it was, whether it was designated for

6    other customers.  He doesn't even know what products are in

7    the inventory.  He just has some totals that are all Dow

8    solution polyethylene products merged together.  He doesn't

9    know what they are.

10             THE COURT:  And that is what he has.  That is

11   the page you showed me; correct?

12             MR. FELDSTEIN:  Correct, Your Honor.

13             THE COURT:  And he gave you a timely opinion

14   based on that; right?

15             MR. FELDSTEIN:  He gave an opinion.  I agree,

16   Your Honor.

17             THE COURT:  Is your motion in limine trying to

18   get rid of his testimony based on inventory entirely?

19             MR. FELDSTEIN:  It is, Your Honor.  For him to

20   be able to -- I mean if he wants to speak to the fact that

21   here is what Dow's inventory was, we have no problem with

22   that.  It is the opinion testimony that lacks foundation.

23   It is the opinion testimony that Dow could have relied on

24   that to fill up short term supply issues that he doesn't

25   have foundation to be able to address.  He just doesn't

1     know, one way or another, what was in that inventory and

2     whether it could ever be used to address the short term

3     supply issues.

4             That we're going to address this coming up

5     where they were out of octane.  They just couldn't make more

6     polymer, where they were out of production capacity and they

7     just couldn't make more.

8             And we expect his fallback is going to be

9     inventory, inventory, and inventory.  And because he doesn't

10    know what inventory was, there is no foundation for his

11    testimony to be able to say Dow could have relied on

12    inventory that is unknown to him except for its total.  But

13    its total is at last three different products.  It's this

14    Elite product, it's this other Dallas product, it's this

15    other HDPE, high density polyethylene product.

16            I'm glad to know he is not going to be relying

17    on new foundation, but without new foundation he has nothing

18    except for total monthly sales.  He doesn't know what limit

19    Dow internally sets when it requires there to be a minimum

20    inventory to meet demand from existing customers.  He

21    doesn't know.  He shouldn't be opining on what Dow could or

22    could not have done with its inventory.

23            THE COURT:  Do you want to address the other

24    two?

25            MR. FELDSTEIN:  I do, Your Honor.  If I may.

1          So in response to No. 2, Motions in Limine 2 and

2    3, I want to make it clear that we're going to be getting

3    two new opinions from Mr. Hoffman that are different than

4    the original trial.  The first one is that in the original

5    trial, Dow always had unused capacity on its equipment and

6    there was no shifting around of product to make space.

7          We're getting a new opinion from Mr. Hoffman

8    that I'm going to move product from A plant to B plant to

9    C plant.  That is a new opinion.  And what the consequence

10   of this opinion and why it's different than before is

11   because you are moving products from one plant to another,

12   now things like the transportation costs come into play

13   because if you are making up in Canada for a Canadian

14   customer and Mr. Hoffman wants to move it down to Louisiana,

15   then you have added an additional leg of transportation.  It

16   doesn't average out the way they would like it to make it

17   seem.  It's an additional new transaction that is not

18   accounted for in his opinions.

19         His other new opinion is he did have an opinion

20   before that there was an 80 percent capture rate for Dow of

21   Nova sales.  That was his prior opinion.  What his new

22   opinion is, is that the market hasn't changed.  That is his

23   affirmative opinion.  He has the affirmative opinion that

24   nothing has changed.  Therefore, I will apply my 80 percent

25   capture rate from before.

1          But the idea of nothing has changed is his new

2    opinion, and that is what doesn't have a foundation because,

3    again, he only spoke with a limited number of interested Dow

4    employees who just told him that nothing has changed, and

5    the case law we cite, including *Power Integrations* suggests

6    that is not a valid foundation.

7          The last thing I believe on, Your Honor, Motion

8    in Limine No. 2 is that it doesn't seem to be this

9    argument any more that the documents that were generated for

10   litigation purposes that are part of our Motion in Limine 2

11   were in fact just that:  documents generated for litigation

12   purposes that shouldn't be relied on by Mr. Hoffman as

13   supposed factual documents.

14         These are the documents again where they were

15   created, where the witnesses admitted they were created at

16   the direction of counsel and that where we had objections

17   and Dow's counsel prevented us from asking what were the

18   instructions in generating these documents.

19         THE COURT:  All right.  Thank you.

20         I assume you haven't waived any of your

21   arguments; correct?

22         MR. NIMROD:  You asked me to move on before I

23   got to that one, Your Honor.

24         THE COURT:  Fair enough.  We're going to move

25   on.  I am going to take a brief recess and then come back

1    and give you rulings.

2                    (Brief recess taken.)

3                    *      *      *

4                    (Proceedings reconvened after recess.)

5                    THE COURT:  Let me give you the rulings on the

6    motions that you have argued.  It will be easy to keep track

7    of.  I'm denying all of them.  Let me be a little bit

8    specific.

9                    On the motion to stay, I'm denying but it is

10   without prejudice to Nova renewing its request for stay of

11   entry of judgment as part of post-trial briefing, so I have

12   not made a final decision on that issue.  So if Nova renews

13   that request and spends some time in the next briefing

14   renewing that request, I will consider it again.

15                   On the question of whether or not we should

16   have this trial later this month, I think that is clearly

17   a matter within my discretion, and I think all of the

18   discretionary factors point towards going forward with

19   trial.  I don't see any real likelihood of simplification of

20   the issues for trial.  It's possible, of course, if all of

21   the asserted claims of the patent are found invalid and if

22   we were to wait long enough for that happen, then arguably,

23   at least arguably I wouldn't need any trial.  But short of

24   that, and I'm not willing to wait however long that would

25   take, this is already a very narrow supplemental damages

1    trial.  It is only going to take a couple days.  There is no

2    overlap between the issues in front of me and what is in

3    front of the PTO, so I really don't think simplification or

4    the potential for it favors a stay at this time.

5              In terms of the relative stage of the

6    proceedings, this case is, of course, extremely advanced

7    whereas the reexamination has just begun, so that does not

8    favor a stay.

9              In terms of prejudice, I understand Nova has

10   identified factors that arguably reduce the prejudice that

11   Dow would have faced, had I stayed the case.  That is, the

12   patents are expired, the period at issue is fixed and

13   closed and not that long ago.  Dow has already collected a

14   significant judgment.  So all of those things I suppose

15   reduce the prejudice there would be to Dow were I to stay

16   the case.  But it doesn't result in the conclusion that

17   there is no undue prejudice to Dow if I stay the case.

18             Any delay, of course, can always lead to some

19   difficulty with proof.  But mostly it just seems to me here,

20   Dow having litigated for over seven years, having won in

21   front of the jury, having won in front of Judge Farnan,

22   having won in the Federal Circuit, having prevailed in the

23   Supreme Court is in a position where it is fair to expect

24   that we should get this case wrapped up, whatever remains

25   to be done with it.

1                    I do recognize there is at least arguable

2       prejudice to Nova from proceeding at this time, though I'm

3       not persuaded on the fundamental legal issue yet by Nova,

4       but to the extent Nova may be correct on the legal issue,

5       I'm going to give them a chance to make that argument again,

6       as I have already said, in connection with the posttrial

7       briefing before I enter judgment.  And also in terms of

8       prejudice, I think it is very noteworthy that Nova could

9       have sought the reexamination much earlier than it did.

10                   So that's the ruling on the stay.

11                   On the motions in limine, as I say, they're all

12      denied.  Let me just speak briefly to some of the reasoning.

13                   Dow's Motion in Limine No. 1, to exclude

14      testimony of Nova's expert, Mr. Tanger, that Dow is entitled

15      to no lost profits.  I'm not persuaded that the criticisms

16      amount to an improper fit such that I should exclude this

17      expert testimony entirely.  They may very well be valid

18      criticisms but they can be adequately explored through

19      cross-examination and competing expert testimony.

20                   Fundamentally, I do agree with Nova that Dow

21      does have to prove its entitlement to lost profits damages

22      for a supplemental period.  That has not been resolved yet

23      and that is part of what this trial is going to be about.

24                   Dow's Motion in Limine No. 2, to exclude

25      testimony relating to acceptable noninfringing alternatives

1    to the parties' products.  That motion is denied as well.

2              Strictly speaking, I find that neither

3    collateral estoppel nor law of the case is a bar to this

4    testimony as, again, strictly speaking, the issue of

5    acceptable noninfringing alternatives in the time period

6    in front of me now was not at issue at the prior trial; and

7    it seems to me it is at least possible that while what is

8    available did not change, perhaps what is acceptable did

9    change and so is a matter of dispute, and we'll hear

10   evidence going to that dispute.  So we're not going to

11   exclude the testimony.

12             Turning to Nova's motions in limine, all three

13   of them go to Mr. Hoffman.  I feel all three of them raise

14   issues that go more to the weight than to the admissibility

15   of Mr. Hoffman's evidence and his opinions.

16             In particular, Motion in Limine No. 2 seems to

17   me to be primarily an untimely discovery dispute.  As counsel

18   here know, it is not that I necessarily love discovery

19   disputes but there is a time and a place for them, and not

20   having complained to me about the failure to disclose these

21   complex models or computer software or whatever it was, not

22   having complained and sought a ruling from me during

23   discovery, I think it is too late to raise that concern now.

24   But in any event, Dow is not presenting that evidence at trial

25   and none of their witnesses are going to rely on or discuss

1    those models at trial.

2              I'm just simply not persuaded by Nova's other

3    arguments about unreliable hearsay, documents being created,

4    you know, somehow that foundation will not be laid.  We

5    saw all that in the papers.  I am not persuaded by those

6    arguments as a basis for excluding the testimony.

7              Nova's Motion in Limine No. 3.  To exclude the

8    opinions regarding production shifting and market dynamics.

9    I think there is, to some extent, an overlap with Motion in

10   Limine No. 2 and, just fundamentally, it seems to me Mr.

11   Hoffman is qualified to opine that Dow would have found a

12   way to shift its production to obtain greater profits in

13   the absence of Nova's infringement.  He is going to give an

14   opinion I guess very similar to what he was allowed to give

15   at the first trial about the 80 percent capture rate, and

16   the criticisms of that opinion again seems to me go to

17   weight and not admissibility.

18             Similarly, on Nova's Motion in Limine No. 4,

19   regarding the finished goods opinion, I still think these

20   criticisms go to weight and not admissibility.

21             Mr. Hoffman has the foundation that he has

22   which he timely disclosed in his report.  He is not going

23   to be supplementing that.  His basis for his beliefs about

24   inventory are what they were at the time that he provided

25   that information and that opinion to Nova.  And that is

1   consistent with the Court's ruling, and we're going to allow

2   him to testify.

3           So that is the rulings on the motions.

4           I have just a few more things to say relating

5   to the pretrial order.  There really wasn't much in dispute.

6   If you all had an agreement in the pretrial order and I

7   don't talk about it here, then it is acceptable, it is

8   hereby adopted.  It will govern trial as we go forward.

9           In terms of the uncontested facts, they are

10  agreed to and they will require no proof at trial.

11          The factual issues to be tried and legal issues

12  to be tried.  I don't think there is anything unique at this

13  point to know what this case is about.  Is that correct from

14  Dow's perspective?

15          MR. NIMROD:  Yes, Your Honor.

16          THE COURT:  And Nova?

17          MR. FELDSTEIN:  Your Honor, we have an issue

18  with their late claiming willfulness that only appeared for

19  the first time in the pretrial order.  I can address it now,

20  if you would like.

21          THE COURT:  Yes, go ahead.

22          MR. FELDSTEIN:  Dow has raised for the first

23  time they're going to seek at trial enhanced damages for

24  willfulness based on part of the sales period at issue.

25  This, Your Honor may recall, you ruled in our favor on

1    motion for summary judgment in August, that summary judgment

2    of no willfulness.

3            Part of that motion in the first place was no

4    willfulness as a whole, there was a subset of the issue, no

5    willfulness post-trial, and Your Honor specifically granted

6    our motion.  So we think the issue is already decided there

7    is no willfulness.

8            Even if it hadn't been decided, they never plead

9    it separately from the original case.  They didn't plead

10   willfulness supplement to damages.  They didn't disclose

11   any intent to seek supplemental damages in expert reports

12   or in interrogatories.  Their interrogatories are silent

13   on whether they're going to be seeking that remedy.  So

14   essentially we think it has been decided and even if it

15   hasn't, that their failure to disclose that should foreclose

16   it.

17           THE COURT:  Who is going to speak to this from

18   Dow?

19           MR. NIMROD:  I will, Your Honor.

20           Your Honor, what was decided with the original

21   motion was whether or not Nova was a willful infringer when

22   it launched the infringing product with knowledge of our

23   patent.  The case law is clear that if there is a situation

24   where there is a ruling by the Court, a jury here, that

25   there is infringement, then there can be an award, an

59

1    enhancement based on the fact that at that point going

2    forward, you in fact can be adjudicated a willful infringer.

3              We pled willfulness here.  And the only thing

4    resolved as I understand it in the first motion for summary

5    judgment had to do with the facts and circumstances relating

6    to whether or not they had an objective basis, that was the

7    basis for your ruling, Your Honor, to assert some defenses

8    in the first trial.

9              THE COURT:  So you plead willfulness.  Was that

10   way back in the original complaint?

11             MR. NIMROD:  That's right, Your Honor.

12             THE COURT:  Did they hear anything of it between

13   the time I ruled on the motions for summary judgment and the

14   pretrial order?

15             MR. NIMROD:  I don't think so, Your Honor.  No.

16   But it's part --

17             THE COURT:  Is it in your expert reports or

18   anything?

19             MR. NIMROD:  No, no.  Your Honor, we don't have

20   an expert on that issue.

21             THE COURT:  If I don't exclude it at this time,

22   how is it going to affect the evidence at trial?

23             MR. NIMROD:  Your Honor, there would be no

24   further evidence at trial.  Our position is, and we have

25   supported, cited cases on it, is that once there has been a

 1    ruling by the Court that there is in fact infringement and

 2    the patent is valid at that point, then at that point you

 3    become a willful infringer.

 4            THE COURT:  All right.  Thank you.  We'll

 5    resolve this in connection with the post-trial briefing.

 6    It's not going to affect the evidentiary portion.

 7            MR. FELDSTEIN:  May I, Your Honor?  It would

 8    have.  Had we known, we may have provided additional

 9    witnesses on our witness list in the first place which was

10    back in December.

11            THE COURT:  You can make that argument in the

12    post-trial.

13            MR. FELDSTEIN:  Thank you, Your Honor.

14            THE COURT:  I'll take that into account.

15            MR. FELDSTEIN:  Thank you.

16            THE COURT:  In terms of the witnesses, I think

17    you all know I allow direct examination, cross, and

18    redirect.  There is no recross examination.  You need to

19    ask for leave to approach the witness once per witness,

20    then you may freely approach that witness.

21            If you have objections to exhibits, we argue

22    them the morning of trial before we bring the witness in,

23    and any time devoted to arguing those objections will be

24    charged to the objecting party.  I don't take into account

25    who wins on the objection or how long the objecting party

1    argues versus the defending party.

2              In terms of expert testimony, you probably all

3    know if you make an objection that expert testimony is beyond

4    the scope of what the expert had previously disclosed, you

5    do need to make that objection at the trial.  I won't rule on

6    it at trial.  You need to make it and give the other side an

7    opportunity to decide if they want to go forward and elicit

8    that testimony that you are concerned is beyond the scope.

9    And then assuming that testimony comes in, you can renew your

10   objection on post-trial briefing.  If you prevail on it and a

11   new trial is necessitated, I will charge all the costs of a

12   new trial to the party that elicited the objectionable

13   testimony.

14              Are there any questions about that from Dow?

15              MR. NIMROD:  No, Your Honor.

16              THE COURT:  From Nova?

17              MR. FELDSTEIN:  No, Your Honor.

18              THE COURT:  In terms of deposition designations

19   I guess do you have a dispute on this.

20              MR. MARGOLIS:  Your Honor, may I speak to that

21   briefly?

22              THE COURT:  Go ahead.

23              MR. MARGOLIS:  I want to inform the Court I made

24   a proposal to Nova earlier today.  The proposal I made was

25   since we have this dispute about how the time for deposition

1   designations should be handled, our proposal is that we pick

2   a time that the parties be limited to for the total amount

3   of time of depositions and counterdesignations.  We had pro-

4   posed two hours total of deposition and counterdesignation

5   time and, therefore, those deposition designations could be

6   submitted to the Court outside of the trial.  And we would

7   limit it so it's not an extensive amount of total time but

8   that way they wouldn't have to be read in open court.

9            THE COURT:  How much time in addition to those

10  two hours do you think you need for trial?

11           MR. MARGOLIS:  I think we assumed since it was

12  two days that we would have about -- that we would have two

13  full days, about six hours a side.

14           THE COURT:  Okay.  Who from Nova wants to speak

15  to this.

16           MR. FUES:  I can.  Thank you, Your Honor.  It's

17  Eric Fues.  We just fundamentally think we're following the

18  standard procedure in the court which is to read for you

19  testimony in court.

20           We requested a two day trial.  The parties

21  stipulated to a two day trial.  Your Honor ordered a two day

22  trial.

23           We think they're trying to expand the universe

24  of information now that gets into the trial record.  We do

25  think there potentially could be some prejudice to us from

1    this because we do have concerns about things being taken

2    out of context, the record being complicated, not really

3    being able to address things that come in through deposition

4    testimony even if you had counterdesignated testimony.

5              I think the last thing is that, in general, this

6    will just complicate what should be a straightforward trial,

7    as Your Honor has already noted.  A straightforward two-day

8    trial.

9              THE COURT:  All right.  Thank you.  Well, I have

10   had experience doing this each way, and I have found and I

11   am going to adhere to what is my general practice.  I have

12   found it more effective to me to make you present your

13   deposition testimony at trial.  You have me and such as it

14   is my attention while I'm there, and it requires you to make

15   your decisions as to what is important to your case and

16   for us to have it all in front of us at the time that we're

17   thinking about your case.

18             So the deposition time is going to count towards

19   your limit.  I do have a preference if the deposition is

20   on video, we do find it more effective usually to watch the

21   video.  I won't force you to do that.  If you want to put

22   lawyers on the stand and read as quickly as they can, you

23   can do that, but it's generally not effective.

24             What you have exchanged in the proposed pretrial

25   order I view as the final maximum universe of designations

1    and counterdesignations and objections to deposition testimony.

2    I hope that you will work together to narrow all of that down.

3    But, again, whatever ultimately you present as depositions

4    at trial will come out of the time that I am going to

5    allocate to you.

6            To the extent there are remaining objections, I

7    want a joint letter by Friday, April 26th at 3:00 p.m.

8    listing for me, making clear for me exactly any witnesses

9    to whom there are still objections to their deposition

10   testimony.  That is, objections to designations or counter-

11   designations or counter-counterdesignations.  Give me a

12   letter and show me exactly where I can find those objectionable

13   portions and get to me as well copies of those depositions

14   so I can review the objectionable portions, and then I will

15   do my best to give you a ruling by the time we begin trial

16   the following week as to whether the testimony can all be

17   played or not.  Then when we do get to trial, when you call

18   that witness to testify by deposition, you need to provide

19   us with two copies of just the excerpts of the transcript

20   that are going to be read or played.

21           Are there any questions about depositions from

22   Dow?

23           MR. NIMROD:  No, Your Honor.

24           MR. FELDSTEIN:  No, Your Honor.

25           THE COURT:  Okay.  In terms of exhibits, what

1    you have listed here in the pretrial order I consider to be

2    the maximum universe of exhibits as well as the maximum

3    universe of objections.  Two exhibits.  You have your

4    agreement as to when you are going to disclose to one

5    another the specific exhibits you use on direct examination.

6    You will meet and confer about objections.  To the extent

7    there are any remaining objections, you bring those to my

8    attention the morning of trial that you anticipate that

9    witness will testify.  If you don't do that, then that

10   objection, unless it really could not have been anticipated,

11   is waived.

12              Are there any questions about exhibits from Dow?

13              MR. MARGOLIS:  Just one thing, Your Honor.

14              One thing a bit unusual in this case is Nova has

15   raised a substantial number of authenticity objections.  You

16   heard some of that from Mr. Feldstein today.

17              We had sent over to Nova last night some 902(11)

18   certifications to try to resolve some of these authenticity

19   and business record type objections that were raised because

20   we need a mechanism to try to figure out if they're going to

21   continue to object to those.  So if we need to have someone

22   to come out and testify for the sole purpose of allowing a

23   foundation for a document, obviously, we need to do that I

24   think on a different schedule than maybe the other type of

25   exhibit objections.

1              Hopefully, we'll be able to resolve that amongst

2    the parties but I did want to let the Court be aware of that

3    and also we're trying to resolve it.

4              THE COURT:  I appreciate you letting me know it.

5    Do you want to propose a date?

6              MR. MARGOLIS:  Yes, that is what we were hoping

7    to get.  We can do that -- could we do that as part of the

8    April 26th letter as well?

9              MR. NIMROD:  Give them our -- we need the

10   responsive memo.

11             MR. MARGOLIS:  Oh, I guess, yes.  We asked in

12   the certifications for a response.  So I guess we just need

13   to know.

14             THE COURT:  Let's see what Nova has to say.

15             MR. FELDSTEIN:  Your Honor, we just got it last

16   night at 6:00.  We haven't had a lot of time to look at it.

17   But we're concerned that there are inconsistencies between

18   averments in the declarations and witness testimony, and it

19   may be that we need additional discovery from the witnesses

20   regarding their declarations that we want to resolve before

21   trial.  We're still battling.  As I say, we just got that

22   last night.

23             I also wanted to bring to the Court's attention

24   we may need to seek additional depositions of the declarant

25   before trial, and that we may have, based on their news

1   assertions in their affidavits, additional objections that

2   are not in the pretrial order at this point.

3              THE COURT:  How long do you think you need to

4   figure that out before you let them know your position?

5              MR. FELDSTEIN:  I would hope by Tuesday.

6              THE COURT:  Okay.  Well, get back to them by

7   Tuesday, and then you all meet and confer and get back to me

8   by Thursday of next week.  We'll get it a joint letter from

9   the plaintiff on behalf of all parties.  Tell me whether,

10  if you have not worked this out, give me your proposal or

11  proposals for what you need me to do in order to help you

12  work it out.

13             MR. MARGOLIS:  Thank you, Your Honor.

14             THE COURT:  In terms of openings and closing,

15  you have agreed to forego closing arguments.  That's fine.

16  I don't require openings.  I have found them to be helpful

17  but that's up to you if you want to use some of your time on

18  an opening or not.  There will be post-trial briefing and

19  we'll discuss the did tails of post-trial briefing at the

20  end of trial.

21             It is a timed trial, of course.  Basically if I

22  am on the bench, then the time is counting towards somebody.

23  I do, of course, reserve the right to shift time from one

24  side to the other if anybody is abusive, I certainly don't

25  expect that.

1              It is a two-day trial.  I can give a maximum of

2     six and-a-half hours per side.  Nobody is asking for less

3     than that, I take it.

4              MR. NIMROD:  No, Your Honor.

5              MR. FELDSTEIN:  No, Your Honor.

6              THE COURT:  All right.  We'll begin on Tuesday,

7     April 30th at 8:30.  As of now, I am available until 4:30

8     that day.  Then the next day on Wednesday, May 1st, I am

9     also available at 8:30 and probably until 5:30.  We will

10    limit the breaks as much as we can.  We will aim for about

11    15 minutes in the morning and 15 minutes in the afternoon.

12    And I can do lunch fairly quickly.  Sometimes that is harder

13    for you all, but I am going to try to keep lunch to a half

14    hour or less so that we can make sure we get this all in in

15    your two days.

16             If you do have any submissions after the trial

17    day or weekends or if there is any holidays between now and

18    trial, make sure you serve a courtesy copy by e-mail either

19    to Mr. Looby or Mr. Golden.  They will make sure I see it in

20    a timely manner.

21             That is all the issues I have.  Is there

22    anything from Dow?

23             MR. NIMROD:  Nothing further, Your Honor.

24             THE COURT:  No?  Okay.  Is there anything from

25    Nova?

1              MR. FELDSTEIN:  No, Your Honor.  Thank you.

2              THE COURT:  Okay.  Thank you very much.  Have

3     safe travels and a good weekend.  We will be in recess.

4              (Pretrial conference ends at 5:05 p.m.)

5

6         I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.

7

8                         /s/ Brian P. Gaffigan
                        Official Court Reporter
9                        U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25